William L. CALLEY, Jr., Petitioner-Appellee, Cross-Appellant,

v.

Howard H. CALLAWAY, etc., et al., etc., Respondents-Appellants, Cross-Appellees.

No. 74-3471.

United States Court of Appeals, Fifth Circuit.

Sept. 10, 1975.

---

1. We do not decide in this case whether or not a decision to appeal can be delegated at all.

Ronald T. Knight, Charles T. Erion, Asst. U. S. Attys., Macon, Ga., Capt. Arnold Anderson Vickery, Office of Gen. Counsel, Dept. of the Army, Pentagon, Washington, D. C., Capt. David P. Schulingkamp, Office of the Judge Advocate Gen., Washington, D. C., S. Cass Weiland, Crim. Div., Dept. of Justice, William A. Patton, Office of the Sol. Gen., Washington, D. C., for respondents-appellants, cross-appellees.

Kenneth Henson, Columbus, Ga., J. Houston Gordon, Covington, Tenn., G. W. Latimer, Salt Lake City, Utah, for petitioner-appellee, cross-appellant.

Before WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK and RONEY, Circuit Judges.*

AINSWORTH, Circuit Judge:

In this habeas corpus proceeding we review the conviction by military court-martial of Lieutenant William L. Calley, Jr., the principal accused in the My Lai incident in South Vietnam, where a large number of defenseless old men, women and children were systematically shot and killed by Calley and other

* Chief Judge Brown and Circuit Judge Gee took no part in the consideration or decision of this case.

American soldiers in what must be regarded as one of the most tragic chapters in the history of this nation's armed forces.

Petitioner Calley was charged on September 5, 1969, under the Uniform Code of Military Justice, 10 U.S.C. § 801 et seq., with the premeditated murder on March 16, 1968 of not less than 102 Vietnamese civilians at My Lai (4) hamlet, Song My village, Quang Ngai province, Republic of South Vietnam.[1] The trial by general court-martial began on November 12, 1970, at Fort Benning, Georgia, and the court members received the case on March 16, 1971. (The function of court members in a military court-martial is substantially equivalent to that of jurors in a civil court.) On March 29, 1971, the court-martial, whose members consisted of six Army officers, found Calley guilty of the premeditated murder of not fewer than 22 Vietnamese civilians of undetermined age and sex, and of assault with intent to murder one Vietnamese child.[2] Two days later, on March 31, 1971, the court members sentenced Calley to dismissal from the service, forfeiture of all pay and allowances, and to confinement at hard labor for life. On August 20, 1971, the convening authority, the Commanding General of Fort Benning, Georgia, approved the findings and sentence except as to the confinement period which was reduced to twenty years. See Article 64 of the Uniform Code of Military Justice (U.C.

M.J.), 10 U.S.C. § 864. The Army Court of Military Review then affirmed the conviction and sentence. *United States v. Calley,* 46 C.M.R. 1131 (1973).[3] The United States Court of Military Appeals granted a petition for review as to certain of the assignments of error, and then affirmed the decision of the Court of Military Review. *United States v. Calley,* 22 U.S.C.M.A. 534, 48 C.M.R. 19 (1973); see Art. 67(b)(3), U.C.M.J., 10 U.S.C. § 867(b)(3).[4] The Secretary of the Army reviewed the sentence as required by Art. 71(b), U.C.M.J., 10 U.S.C. § 871(b), approved the findings and sentence, but in a separate clemency action commuted the confinement portion of the sentence to ten years. On May 3, 1974, President Richard Nixon notified the Secretary of the Army that he had reviewed the case and determined that he would take no further action in the matter.

■ On February 11, 1974, Calley filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia against the Secretary of the Army and the Commanding General, Fort Benning, Georgia. At that time, the district court enjoined respondents from changing the place of Calley's custody or increasing the conditions of his confinement. On February 27, 1974, the district court ordered that Calley be released on bail pending his habeas corpus application.

1. There was a Charge and an Additional Charge against Calley, each of which contained two Specifications. Specification 1 under the Charge accused Calley of the premeditated murder of not less than 30 Oriental human beings; Specification 2 accused him of the premeditated murder of not less than 70 Oriental human beings. Specification 1 under the Additional Charge accused Calley of the premeditated murder of one Oriental male human being; Specification 2 accused him of the premeditated murder of one Oriental human being approximately two years old, whose name and sex are unknown.

2. The findings of the court members as to the charges were as follows: (1) under Specification 1 of the Charge, guilty of the premeditated murder of not less than one person; (2)

under Specification 2 of the Charge, guilty of the premeditated murder of not less than 20 persons; (3) under Specification 1 of the Additional Charge, guilty as charged; (4) under Specification 2 of the Additional Charge, guilty of assault with intent to commit murder. Tr. at 5044.

3. The Court of Military Review is established by the Judge Advocate General, with one or more panels composed of three appellate military judges. See Art. 66, U.C.M.J., 10 U.S.C. § 866.

4. The Court of Military Appeals is established under article I of the U. S. Constitution and consists of three civilian judges appointed by the President. See Art. 67, U.C.M.J., 10 U.S.C. § 867.

On June 13, 1974, this Court reversed the district court's orders, returning Calley to the Army's custody. *Calley v. Callaway,* 5 Cir., 1974, 496 F.2d 701. On September 25, 1974, District Judge Elliott granted Calley's petition for a writ of habeas corpus and ordered his immediate release. The Army appealed and Calley cross-appealed. At the Army's request a temporary stay of the district judge's order of immediate release was granted by a single judge of this Court. See Rule 27(c), Fed.R.App.P. This Court subsequently met *en banc,* upheld the release of Calley pending appeal, and ordered *en banc* consideration of the case. We reverse the district court's order granting a writ of habeas corpus and reinstate the judgment of the court-martial.[5]

## I. Summary of the Facts

On March 16, 1968, in the small hamlet of My Lai, in South Vietnam, scores of unarmed, unresisting Vietnamese civilians were summarily executed by American soldiers. A number of American soldiers were charged[6] but only First Lieutenant William Calley was convicted of murder in what has been called the My Lai Incident and also the My Lai Massacre. The facts, which are largely undisputed, are set forth in considerable detail in the written opinions of the military courts, and will be summarized only to the extent necessary for our purposes.[7]

Lieutenant Calley was the 1st platoon leader in C Company, 1st Battalion, 20th Infantry, 11th Light Infantry Brigade, and had been stationed in Vietnam since December of 1967. Prior to March 16, 1968, his unit had received little combat experience. On March 15, members of the unit were briefed that they were to engage the enemy in an offensive action in the area of My Lai (4). The troops were informed that the area had long been controlled by the Viet Cong, and that they could expect heavy resistance from a Viet Cong battalion which might outnumber them by more than two to one. The objective of the operation was to seize the hamlet and destroy all that could be useful to the enemy.

The attack began early in the morning of March 16. Calley's platoon was landed on the outskirts of My Lai after about five minutes of artillery and gunship fire. The assault met no resistance or hostile fire. After cautiously approaching My Lai (4), C Company discovered only unarmed, unresisting old men, women and children eating breakfast or beginning the day's chores although intelligence reports had indicated the vil-

---

**5.** The Army has granted Calley's application for parole and he has been released from confinement. This fact, however, does not deprive the federal courts of habeas corpus jurisdiction, for a person on parole is "in custody" for purposes of habeas corpus jurisdiction. *Jones v. Cunningham,* 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). See also 28 U.S.C. § 2253, which grants this court jurisdiction to review on appeal the final order in a habeas corpus proceeding before a district judge.

**6.** Information in the record, particularly in the volumes containing newspaper clippings and magazine articles, shows that a total of 12 infantrymen were formally charged with violations of the U.C.M.J. for their part in the My Lai incident. Some of these individuals went to trial and were acquitted, while the charges against others were dropped. A number of soldiers participating in the My Lai incident (as many as 22) could not be charged by the Army as they were civilians and no longer amenable to trial by court-martial for their acts while in uniform, under *Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

**7.** The Army Court of Military Review was required to evaluate both the facts and all legal challenges raised by Calley. Article 66(c), U.C.M.J., 10 U.S.C. § 866(c) provides that the Court of Military Review

> may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as it finds correct in law and in fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.

The Court of Military Review, pursuant to Art. 67(b), U.C.M.J., 10 U.S.C. § 867(b), granted review of three of the 30 issues urged by petitioner on appeal. One of the issues considered by the Court of Military Appeals was the sufficiency of the evidence.

lagers would be gone to market. Encountering only civilians and no enemy soldiers, Calley's platoon, which was to lead the sweep through the hamlet, quickly became disorganized. Some soldiers undertook the destruction of livestock, foodstuffs and buildings as ordered. Others collected and evacuated the Vietnamese civilians and then proceeded systematically to slaughter the villagers.

Specification 1 of the first charge against Calley stemmed from events occurring at a collection point for civilians along a trail in the southern part of My Lai (4). This charge was also first in time of the charges against Calley. The remaining charges and specifications also followed in chronological sequence. The initial charge, with two specifications, related to two separate group killings at different locations. Private First Class Meadlo was guarding a group of between 30 and 40 unarmed old men, women and children at the trail location. Calley approached Meadlo and told him, "You know what to do," and left. Meadlo continued to stand guard over the villagers. Calley returned and yelled at Meadlo, "Why haven't you wasted them yet?" Meadlo replied that he thought Calley had meant merely to watch the villagers. Calley replied, "No, I mean kill them." First Calley and then Meadlo opened fire on the group, until all but a few children fell. Calley then personally shot the remaining children. In the process, Calley expended four or five magazines from his M–16 rifle. Calley was charged with the premeditated murder of not less than 30 human beings as a result of the killings at this location. Although numerous bodies, about 20, were shown at this point by photographs introduced in evidence, a pathologist testified that he could point to only one wound on one body which, in his opinion, was certain to have been instantly fatal. The court members found Calley guilty under this specification of the murder of not less than one human being.

After the killings along the trail at the southern edge of My Lai (4), Calley proceeded to the eastern portion of the hamlet. There, along an irrigation ditch, another and larger group of villagers was being held by soldiers. Meadlo estimated the group contained from 75 to 100 persons, consisting of old men, women and children. Calley then ordered Meadlo, stating: "We got another job to do, Meadlo." The platoon members with their weapons then began pushing these people into the ditch. They were yelling and crying as they knelt and squatted in the ditch. Calley ordered the start of firing into the people and he with Meadlo and others joined in the killing. Private First Class Dursi refused to follow Calley's order that he assist with the executions; he testified, "I couldn't go through with it. These little defenseless men, women, and kids." Specialist Fourth Class Maples refused Calley's request for Maples' machine gun to be used in the killing. A number of different groups of civilians were brought to the ditch, there to be slaughtered by the soldiers at point-blank range. A helicopter pilot landed his craft near the ditch, and had a discussion with Calley. The pilot was able to evacuate some of the villagers from the scene. After speaking to the pilot, Calley returned to the ditch and resumed the killing, stating, "I'm the boss here." In all, Calley supervised and participated in killings at the ditch for about forty-five minutes to an hour, and personally expended between 10 and 15 magazines of ammunition. Calley was charged with the murder of not less than 70 human beings at the ditch; the court members found him guilty of the murder of not less than 20 persons.

After the incident at the ditch, Calley and Specialist Fourth Class Sledge encountered a forty- to fifty-year-old man dressed in the white robes of a monk. After questioning the man whether he was a Viet Cong, Calley shot the man in the face, blowing half his head away. The court members found Calley guilty of the premeditated murder of one male human being, as charged.

Sledge testified that immediately after the shooting of the monk,

> Someone hollered, "there's a child," you know, running back toward the village. Lieutenant Calley ran back, the little—I don't know if it was a girl or a boy—but it was a little baby, and he grabbed it by the arm and threw it into the ditch and fired.

Sledge stated he observed this from a distance of 20–30 feet. He testified one shot was fired by Calley at the child from a distance of 4 or 5 feet, but did not see whether it struck. Calley was charged with the premeditated murder of one human being approximately two years old; the court members found him guilty of assault with intent to commit murder on this charge. A total of two to four hours had elapsed between the time the attack on My Lai (4) began and the killing of the villagers was completed.

At trial and on appeal to the military courts, Calley's participation in most of the killings was conceded—those at both the trail and the ditch. Calley admitted ordering Meadlo to kill the villagers at the trail, and admitted that he fired into the people at the ditch with his gun's muzzle within 5 feet of the people kneeling or squatting there. He denied killing the monk, stating he merely "butt-stroked" the man in the face with the butt of his rifle, and also denied killing the two-year-old child. The major emphasis of Calley's defense was that he was not legally responsible for the killings because there was an absence of malice on his part, that he thought he was performing his duty in the operation, having been ordered by Captain Medina to kill everyone in the village. Calley's principal defense, therefore, was his claim that the night before the attack on My Lai (4) and two times by radio while he was present in the village, he had received orders from Captain Medina to kill all villagers the soldiers encountered. Captain Medina, who was called as a witness at the request of the court members, stated that during the briefing on the night of March 15 he was asked by someone specifically whether women and children were to be killed. He testified that his answer was:

> No, you do not kill women and children. You must use common sense. If they have a weapon and are trying to engage you, then you can shoot back, but you must use common sense.

There was considerable dispute at the trial about this statement. Twenty of the 27 persons who were members of Calley's platoon on March 16 testified at trial, along with others who were presented at the briefing. Some stated that Medina's answer to the question was "Yes, it means women and children," while most of these witnesses, however, had no recollection of orders by Medina at the briefing to kill women and children. The findings of guilty of the court members resolved what was a classic jury issue.

Calley further claimed that he had received orders by radio directing him to dispose of the Vietnamese and get on to other duties during the day of March 16 while he was in My Lai (4). Calley's testimony in this regard was not substantiated by the two persons who acted as radio operators to Captain Medina on March 16. One of the operators stated he had no recollection either way regarding such orders. The other operator stated positively that no orders to kill or waste civilians went out over the unit radio to Calley. Moreover, even if Calley had received the orders as claimed, he would not necessarily have been exonerated. The military judge properly instructed that an order to kill unresisting Vietnamese would be an illegal order, and that if Calley knew the order was illegal or should have known it was illegal, obedience to an order was not a valid defense. Thus, the military jury could have found either that the alleged order to kill was not issued, or, if it was, that the order was not a defense

to the charges. The military courts found ample evidence to support either hypothesis.[8]

With this review of the facts, we turn to the issues on appeal. District Judge Elliott's extensive written opinion concluded that Calley was entitled to a writ of habeas corpus for four principal reasons: (1) prejudicial pretrial publicity concerning the My Lai incident and Calley's participation therein deprived him of an opportunity to receive a fair and impartial trial; (2) the military judge's failure to subpoena certain witnesses requested by the defense deprived Calley of his right of confrontation and compulsory process and deprived him of due process; (3) the refusal of the House of Representatives to release testimony to the defense taken in executive session in its My Lai investigation deprived Calley of due process; and (4) the Charges, Specifications and Bill of Particulars under which Calley was tried did not adequately notify him of the charges against him nor fully protect him against possible double jeopardy.

## II. Scope of Review of Court-Martial Convictions

We must first consider the extent to which a federal court is empowered to review court-martial convictions on petitions for habeas corpus. The Government contends that the district court ex-ercised an impermissibly broad scope of review of Calley's claims.[9] Relying on *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), the Government argues that review by the federal courts is complete after a determination that the military courts have fully and fairly considered Calley's claims, and that, since that has been accomplished by the military courts, further review by way of habeas corpus proceedings is not appropriate.

A brief historical outline is helpful to a determination of this question.[10] The first military habeas corpus case to reach the Supreme Court was *Ex parte Reed,* 100 U.S. 13, 25 L.Ed. 538 (1879).[11] *Reed* held that a federal civil court's inquiry into a military court-martial conviction could extend only so far as to ascertain whether the military court was properly vested with jurisdiction "over the person and the case. . . . Having had such jurisdiction, its proceedings cannot be collaterally impeached for any mere error or irregularity, if there were such, committed within the sphere of its authority." 100 U.S. at 23, 25 L.Ed. at 539. Subsequent Supreme Court decisions followed the jurisdictional test and emphasized that the scope of inquiry for federal courts was limited to whether the court-martial was properly constituted, whether it had jurisdiction over the person and the offense charged, and whether the sentence was authorized by law.

8. The Court of Military Review commented in its opinion:

> If the members found that appellant fabricated his claim of obedience to orders, their finding has abundant support in the record. If they found his claim of acting in obedience to orders to be credible, he would nevertheless not automatically be entitled to acquittal. Not every order is exonerating. 46 C.M.R. at 1182–1183.

9. In a prior decision, this Court held that Judge Elliott erred in granting bail to petitioner pending determination of his petition for a writ of habeas corpus because the Court did not apply the proper standard in determining whether to grant bail. *Calley v. Callaway,* 5 Cir., 1974, 496 F.2d 701.

10. See J. Bishop, Justice Under Fire 113–160 (1974); Bishop, Civilian Judges and Military Justice: Collateral Review of Court-Martial Convictions, 61 Colum.L.Rev. 40 (1961); Katz & Nelson, The Need for Clarification in Military Habeas Corpus, 27 Ohio St.L.J. 193 (1966); Weckstein, Federal Court Review of Courts-Martial Proceedings: A Delicate Balance of Individual Rights and Military Responsibilities, 54 Mil.L.Rev. 1 (1971); Note, Developments in the Law-Federal Habeas Corpus, 87 Harv.L.Rev. 1038, 1208–1263 (1970); Note, Civilian Court Review of Court Martial Adjudications, 69 Colum.L.Rev. 1259 (1969); Note, Servicemen in Civilian Courts, 76 Yale L.J. 380 (1966). See generally Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181 (1962).

11. In two cases prior to *Reed,* the Court had granted writs to civilians tried or held by military tribunals without proper authority. *Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); *Ex parte Yerger,* 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1869).

See, e. g., *Collins v. McDonald*, 258 U.S. 416, 42 S.Ct. 326, 66 L.Ed. 692 (1922); *McClaughry v. Deming*, 186 U.S. 49, 22 S.Ct. 786, 46 L.Ed. 1049 (1902); *Johnson v. Sayre*, 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914 (1895); *In re Grimley*, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890).[12] In general, federal courts would not consider due process attacks on court-martial convictions in habeas proceedings if it appeared that the military court properly possessed jurisdiction when it made its decision.

The jurisdictional test, however, was not limited to military habeas corpus cases, but extended also to criminal convictions in civil courts. Mr. Justice Hughes stated in *In re Gregory*, 219 U.S. 210, 31 S.Ct. 143, 55 L.Ed. 184 (1911) that "[t]he only question before us" in a habeas case is whether the court "had jurisdiction to try the issues and to render the judgment." *Id.* at 213, 31 S.Ct. at 143. In *Knewel v. Egan*, 268 U.S. 442, 45 S.Ct. 522, 69 L.Ed. 1036 (1925), the Court noted that habeas corpus was a means to determine whether a person "is restrained of his liberty by judgment of a court acting without jurisdiction." In reiterating that jurisdiction was the proper inquiry, the Court held that "the judgment of state courts in criminal cases will not be reviewed on habeas corpus merely because some right under the Constitution of the United States is alleged to have been denied to the person convicted." 268 U.S. at 447, 45 S.Ct. at 524–525. See also *Harlan v. McGourin*, 218 U.S. 442, 31 S.Ct. 44, 54 L.Ed. 1101 (1910); *In re Moran*, 203 U.S. 96, 27 S.Ct. 25, 51 L.Ed. 105 (1906); *Dimmick v. Tompkins*, 194 U.S. 540, 24 S.Ct. 780, 48 L.Ed. 1110 (1904); *Storti v. Massachusetts*, 183 U.S. 138, 22 S.Ct. 72, 46 L.Ed. 120 (1901). Thus, "[h]abeas corpus was, prior to World War II, a limited form of relief in both the civilian and the military areas, with the scope of inquiry limited to jurisdiction of the tribunal to hear a given case and render judgment. Procedural considerations—rulings on challenges, pleas, admissibility of evidence—as well as more substantial due process questions were not reviewable on collateral attack." Note, *supra*, 69 Colum.L.Rev. at 1259.

In the late 1930's, however, the Supreme Court first expanded and subsequently abandoned the jurisdiction rubric. The Court began to uphold habeas attacks on federal and state convictions obtained in violation of federal constitutional rights even where the courts possessed jurisdiction in the traditional sense. In *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the Court held that jurisdiction, though present at the beginning of the trial, was "lost" in the course of the trial by the failure to provide counsel for the accused. The Court said that a violation of the Sixth Amendment "stands as a *jurisdictional* bar to a valid conviction and sentence . . . ." 304 U.S. at 468, 58 S.Ct. at 1024 (emphasis added). *Johnson* altered the prior rule—while jurisdiction was still nominally the test, the meaning of jurisdiction was expanded to include due process defects in trial proceedings. Four years later, the Supreme Court finally discarded the jurisdiction test, and in *Waley v. Johnston*, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942), explicitly stated that jurisdiction alone was no longer the sole consideration.[13] The Court held that the Great Writ "extends also to those exceptional cases where the conviction has been in disregard of the constitutional rights of the accused, and where the writ is the only effective means of preserving his rights." 316 U.S. at 105, 62 S.Ct. at 966. In *House v. Mayo*, 324 U.S. 42, 65 S.Ct. 517, 89 L.Ed. 739 (1945), the holding in *Waley*, a federal habeas corpus case, was applied to habeas review of state court

---

**12.** For a collection of pre-*Burns* cases, see Annot., 15 A.L.R.2d 387, 391 (1951).

**13.** The jurisdiction test has been criticized as an unworkable review standard for habeas

corpus cases. See Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441, 470–471 (1963).

convictions. See Hart, The Supreme Court—1958 Term, 73 Harv.L.Rev. 84, 105 (1959). Thus, in civil cases involving both state and federal petitioners, the permissible inquiry in habeas corpus was extended beyond the question of jurisdiction to include also a determination whether the conviction was in disregard of the constitutional rights of the accused.

World War II provided an important impetus for federal courts to broaden habeas corpus review of military cases. When millions of persons suddenly became subject to military justice, greater concern seemed essential. As Chief Justice Warren said in this regard, "When the authority of the military has such a sweeping capacity for affecting the lives of our citizenry, the wisdom of treating the military establishment as an enclave beyond the reach of the civilian courts almost inevitably is drawn into question." Warren, supra, 37 N.Y.U.L.Rev.

at 188. See also Generous, Swords and Scales: The Development of the Uniform Code of Military Justice 14–15, 167–169 (1973). Military law thus had a breadth and impact not previously possessed, requiring greater supervision over the actions of courts-martial.[14] More importantly, there was public concern over the harsh justice and severe sanctions employed by the military during the war. See Bishop, supra, at 117–118; Generous, supra, at 14–21.[15]

Thus, federal courts, having expanded collateral attack in civilian habeas corpus cases, were confronted with new pleas by military defendants that the courts give cognizance to allegations that their convictions were invalid by virtue of constitutional, if not jurisdictional, deficiencies.[16] The stage was thus set for a reevaluation by the Supreme Court of the proper response by federal courts to habeas corpus attacks on court-martial convictions; Burns v. Wilson, 346 U.S.

14. This new importance of military law should be contrasted with earlier periods, when "the military claimed for itself only the most limited jurisdiction. . . ."

> The Nineteenth Century situation, then, was marked by restraint on both sides. The laws governing the armed services closely circumscribed the extent of court-martial jurisdiction. Within those narrow limits, the Supreme Court granted immunity from its purview. As noted earlier, the military codes were specifically military in nature. The federal courts could, with wisdom and rectitude, claim to lack expertise in such matters. On the other hand, neither the Army nor the Navy showed any great desire to become involved in serious felony litigation.

Generous, supra, at 167.

15. One post-war study found that court-martial sentences were "fantastically" severe; another board set aside or reduced about 85 per cent of the 27,500 general court-martial convictions it reviewed. Generous, supra, at 17; see Note, Collateral Attack on Courts-Martial in the Federal Courts, 57 Yale L.J. 483, 488 (1948).

16. The federal courts' response to this situation is best summarized as follows:

> Considering the history of similar limitations applicable to habeas corpus relief in both military and civilian convictions, many

district court and court of appeals judges apparently considered it logical to extend the protection afforded by the Supreme Court's decision in Johnson v. Zerbst to court-martial convictions. The extension of the doctrine of the Johnson case to state convictions in all likelihood reinforced this premise. During the 1940's, the courts of appeals in six circuits ruled that federal courts considering habeas corpus petitions filed by military personnel convicted by courts-martial should determine whether the petitioners' rights to fair trial and due process were violated by the military tribunals. In each circuit the court either traced the expansion of collateral attack and extended it to military personnel or assumed that expansion and then determined whether there was a constitutional violation.

Katz and Nelson, supra, 27 Ohio St.L.J. at 200. For representative cases, see United States ex rel. Weintraub v. Swenson, 2 Cir., 1948, 165 F.2d 756; United States ex rel. Innes v. Hiatt, 3 Cir., 1944, 141 F.2d 664; Smith v. Hiatt, 3 Cir., 1948, 170 F.2d 61, rev'd sub nom. Humphrey v. Smith, 336 U.S. 695, 69 S.Ct. 830, 93 L.Ed. 986 (1949); Montalvo v. Hiatt, 5 Cir., 1949, 174 F.2d 645, cert. denied, 338 U.S. 874, 70 S.Ct. 135, 94 L.Ed. 536; Hiatt v. Brown, 5 Cir., 1949, 175 F.2d 273, rev'd, 339 U.S. 103, 70 S.Ct. 495, 94 S.Ct. 691, (1950); Schita v. King, 8 Cir., 1943, 133 F.2d 283; Benjamin v. Hunter, 10 Cir., 1948, 169 F.2d 512; Kuykendall v. Hunter, 10 Cir., 1951, 187 F.2d 545.

137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), was that reevaluation.[17]

### Burns v. Wilson

The petitioners in *Burns* had been found guilty of rape and murder and sentenced to death by court-martial. Burns alleged in his habeas petition several deprivations of constitutional rights, contending that the military had coerced his confession, suppressed evidence favorable to him, denied him effective counsel, detained him illegally and created an atmosphere of terror and vengeance not conducive to a fair decision. See 346 U.S. at 138, 73 S.Ct. at 1047. The court of appeals affirmed denial of the writs, but only after a detailed review of the facts and the court-martial transcripts. *Burns v. Lovett*, 1952, 91 U.S.App.D.C. 208, 202 F.2d 335.

The Supreme Court affirmed the denial of habeas corpus relief, but stated that the circuit court had "erred in reweighing each item of relevant evidence in the trial record . . . ." 346 U.S. at 146, 73 S.Ct. at 1051. A plurality of the court[18] (Chief Justice Vinson, Justices Burton, Clark and Reed) agreed that the constitutional guarantee of due process was meaningful enough to protect both soldiers and civilians "from the crude injustices of a trial so conducted that it becomes bent on fixing guilt by dispensing with rudimentary fairness . . . ." *Id.* at 142, 73 S.Ct. at 1049. Nonetheless, in reviewing court-martial convictions to ascertain whether due process rights had been abridged, the Court stated that "in military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in civil cases." *Id.* at 139, 73 S.Ct. at 1047. The Court stated that "when a military decision has dealt fully and fairly with an allegation raised in that application [for habeas corpus], it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence." 346 U.S. at 142, 73 S.Ct. at 1049.[19] Its review of the case showed

---

**17.** Only three years prior to *Burns,* the Supreme Court decided two military habeas corpus cases. In *Hiatt v. Brown,* 339 U.S. 103, 70 S.Ct. 495, 94 S.Ct. 691 (1950), the Court reversed a decision by this circuit granting a writ; in so doing, the Court reiterated the limited, traditional jurisdiction test. 339 U.S. at 111, 70 S.Ct. at 498–499. But later the same year, the Court ignored its narrow holding in *Hiatt v. Brown,* and in *Whelchel v. McDonald,* 340 U.S. 122, 71 S.Ct. 146, 95 L.Ed. 141 (1950), took a position midway between the narrow, traditional jurisdictional test and the expansive, more recent jurisdictional test of *Johnson v. Zerbst.* See Note, *supra,* 69 Colum.L.Rev. at 1261. In *Whelchel,* the Court held that denying a military defendant the opportunity to present the question of insanity at his trial could deprive the court-martial of jurisdiction—the decision clearly was a departure from a traditional definition of jurisdiction. In any case, neither case appears to have had a great deal of influence. Only one year after these two Supreme Court decisions, a circuit court was to reiterate that "[d]ue process of law must be observed in military trials the same as trials in civil courts." *Kuykendall v. Hunter,* 10 Cir., 1951, 187 F.2d 545, 546; see also *DeCoster v. Madigan,* 7 Cir., 1955, 223 F.2d 906, 909–910.

**18.** Justice Jackson concurred in the result without opinion. Justice Minton also concurred,

but on the basis that the existence of jurisdiction was the sole proper inquiry; he disapproved of the notion that "the federal courts sit to protect the constitutional rights of military defendants . . . ." 346 U.S. at 146, 73 S.Ct. at 1051. Justice Frankfurter urged the Court to set the case down for reargument, but in his opinion stated:

> I cannot agree that the scope of inquiry is the same as that open to use on review of State convictions; the content of due process in civil trials does not control what is due process in military trials. Nor is the duty of the civil courts upon habeas corpus met simply when it is found that the military sentence has been reviewed by the military hierarchy . . . .

346 U.S. at 149, 73 S.Ct. at 1052. Justices Black and Douglas dissented.

Indeed, one leading military law authority has suggested that the opinion in *Burns* has no precedential value because of its failure to gain majority support. Wiener, Courts-Martial and the Bill of Rights: The Original Practice, Parts I & II, 72 Harv.L.Rev. 1, 266 at 297 (1958).

**19.** Cf. *Durfee v. Duke,* 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (judgment entitled to full faith and credit as to all questions "fully and fairly litigated"); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (federal habeas court must hold own evidentia-

that "the military courts have heard petitioners out on every significant allegation which they now urge." *Id.* at 144, 73 S.Ct. at 1050. The Court concluded:

Accordingly, it is not the duty of the civil courts to repeat that process—to re-examine and reweigh each item of evidence of the occurrence of events which tend to prove or disprove one of the allegations in the application for habeas corpus. *It is the limited function of the civil courts to determine whether the military have given fair consideration to each of these claims.* (citation omitted) We think they have.

*Id.* (emphasis added).

*Burns* thus announced a scope of review in military habeas cases broader than the old jurisdictional test, but narrower than that in state and federal habeas cases. Federal courts have interpreted *Burns* with considerable disagreement.[20] Soon after the decision in *Burns*, we noted the "uncertain state of the law" regarding the proper scope of review. *Bisson v. Howard,* 5 Cir., 1955,

224 F.2d 586, 589–590, cert. denied, 350 U.S. 916, 76 S.Ct. 201, 100 L.Ed. 803. More recently we said that while *Burns* allowed collateral attack on courts-martial, "the scope of that review was left uncertain." *Mindes v. Seaman,* 5 Cir., 1971, 453 F.2d 197, 201. We have stated that, since *Burns*, "the scope of review has been considerably broadened," *Betonie v. Sizemore,* 5 Cir., 1974, 496 F.2d 1001, 1005; that "[c]ourt-martial convictions alleged to involve errors of constitutional proportion have consistently been held to be subject to court review." *Mindes v. Seaman, supra,* 453 F.2d at 201. But we have also stated that there is a "very limited field in which the civilian courts can review court martial proceedings," *Bisson v. Howard, supra,* 224 F.2d at 587, that "[h]abeas corpus review of convictions by court-martial is limited to questions of jurisdiction (citation omitted), and the limited function of determining whether the military has given fair consideration to petitioners' claims, (citing *Burns* )." *Peavy v. Warner,* 5 Cir., 1974, 493 F.2d 748, 749. Other circuits are divided on the proper scope of review.[21]

ry hearing if petitioner did not receive a "full and fair" hearing in state court); *Cardwell v. Lewis,* 417 U.S. 583, 596, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974) (Powell, J., concurring) (no collateral review of Fourth Amendment claim where no contention raised that petitioner was denied "full and fair opportunity to litigate" claim in state court).

**20.** An additional problem with the decision in *Burns* is the historical inaccuracy of one of the opinion's important premises—that "in military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in civil cases." 346 U.S. at 139, 73 S.Ct. at 1047. As the discussion in this opinion indicates, the scope of collateral review of both civilian and military convictions was a narrow "jurisdiction" test, at least until *Johnson v. Zerbst.* Justice Frankfurter argued, in his opinion dissenting from denial of rehearing in *Burns,* that Chief Justice Vinson's historical comment was "demonstrably incorrect," and Frankfurter substantiated his contention with extensive citation. 346 U.S. at 845–849, 74 S.Ct. at 4–6. Other commentators have agreed that there was historically no special rule for reviewing court-martial convictions. See J. Bishop, Justice Under Fire 131–

133 (1974); *Katz and Nelson, supra,* 27 Ohio St.L.J. at 196–199, 212; *Weckstein, supra,* 54 Mil.L.Rev. at 34–35; Note, *supra,* 83 Harv.L. Rev. at 1209–1210; Note, *supra,* 69 Colum.L. Rev. at 1259–1260; Note, *supra,* 76 Yale L.J. at 382–383.

**21.** The Eighth, Ninth and Tenth Circuits appear to accept *Burns* as meaning that the scope of review by federal courts in military habeas cases is narrower than in analogous civilian cases, and these circuits also generally accept that *Burns* focuses a habeas court's inquiry on whether the military courts fairly considered the petitioner's claims. See *Swisher v. United States,* 8 Cir., 1966, 354 F.2d 472, 475; *Harris v. Ciccone,* 8 Cir., 1969, 417 F.2d 479, 481, cert. denied, 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (Blackmun, J.); *Mitchell v. Swope,* 9 Cir., 1955, 224 F.2d 365, 367; *Sunday v. Madigan,* 9 Cir., 1962, 301 F.2d 871, 873; *Broussard v. Patton,* 9 Cir., 1972, 466 F.2d 816, 818, cert. denied, 410 U.S. 942, 93 S.Ct. 1364, 35 L.Ed.2d 609 (1973); *Suttles v. Davis,* 10 Cir., 1954, 215 F.2d 760, 761, cert. denied, 348 U.S. 903, 75 S.Ct. 228, 99 L.Ed. 709; *Gorko v. Commanding Officer,* 10 Cir., 1963, 314 F.2d 858, 859; *Kennedy v. Commandant,* 10 Cir., 1967, 377 F.2d 339, 342. The

With this background we summarize our view of the proper scope of review.

### Determining the Proper Scope of Review

The cited cases establish the power of federal courts to review court-martial convictions to determine whether the military acted within its proper jurisdictional sphere. We are more concerned here, however, with the extent to which federal courts may review the validity of claims that errors in the military trial deprived the accused of due process of law, when the military courts have previously considered and rejected the same contentions. We conclude from an extensive research of the case law that the power of federal courts to review military convictions of a habeas petition depends on the nature of the issues raised, and in this determination, four principal inquiries are necessary.

*1. The asserted error must be of substantial constitutional dimension.* The first inquiry is whether the claim of error is one of constitutional significance, or so fundamental as to have resulted in a miscarriage of justice. Most courts which have interpreted *Burns* to allow review of nonjurisdictional claims have given cognizance only to assertions that

First and Third Circuits agree that *Burns'* "fully and fairly" standard controls the scope of review, but have frankly admitted a difficulty in understanding and applying the standard. See *Allen v. Van Cantfort,* 1 Cir., 1971, 436 F.2d 625, cert. denied, 402 U.S. 1008, 91 S.Ct. 2189, 29 L.Ed.2d 430, which initially states that the scope of review in military issues is "more limited than in comparable civilian cases," but then proceeds to note that "considerable confusion" surrounds *Burns* and that *Burns'* "validity has been questioned and criticized by both courts and commentators since it was first announced," *Id.* at 629; *Levy v. Parker,* 3 Cir., 1973, 478 F.2d 772, 779–783, rev'd on other grounds, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). The District of Columbia Circuit has gone beyond *Burns,* and has held that the scope of review of military judgments should be the same as in habeas review of state or federal convictions, unless it is shown that conditions peculiar to military life require a different rule. *Kauffman v. Secretary of the Air Force,* 1969, 135 U.S.App.

fundamental constitutional rights were violated.[22] The premise that we cannot review a military conviction without substantial claim of denial of fundamental fairness or of a specific constitutional right is strengthened by the holding in *United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), in which the Supreme Court held that the Court of Claims erred in considering petitioners' assertions where only an error of law (an asserted violation of the Jencks Act, 18 U.S.C. § 3500), rather than a constitutional defect or due process violation, was present. See 393 U.S. at 351–352, 352–353, 356, 89 S.Ct. at 531, 532, 533–534. As the Supreme Court has commented, "The writ of habeas corpus has limited scope; the federal courts do not sit to re-try . . . cases *de novo* but, rather, to review for violation of federal constitutional standards." *Milton v. Wainwright,* 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972). See also *Cupp v. Naughton,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *Donnelly v. DeChristoforo,* 416 U.S. 637, 642–643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Ross v. Wainwright,* 5 Cir., 1971, 451 F.2d 298, 301, cert. denied, 409 U.S. 884, 93 S.Ct. 98, 34 L.Ed.2d 141 (1972); *Young v. Alabama,* 5 Cir., 1971, 443 F.2d 854, 855, cert. denied, 405 U.S.

D.C. 1, 415 F.2d 991, 992, 997, cert. denied, 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970).

22. E. g., *Ashe v. McNamara,* 1 Cir., 1965, 355 F.2d 277 ("constitutional rights of the accused were violated"); *Fischer v. Ruffner,* 5 Cir., 1960, 277 F.2d 756 (lack of "essential due process"); *Broussard v. Patton, supra* (constitutional rights); *Betonie v. Sizemore, supra* ("basic constitutional rights"); *Owings v. Secretary of the Air Force,* D.C.Cir., 1971, 145 U.S.App.D.C. 76, 447 F.2d 1245, cert. denied, 406 U.S. 926, 92 S.Ct. 1799, 32 L.Ed.2d 128 ("constitutional defect"); *Levy v. Parker,* 3 Cir., 1973, 478 F.2d 772, 783, rev'd, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) ("infirmity of constitutional dimension"); *Shaw v. United States,* 1966, 357 F.2d 949, 174 Ct.Cl. 899 ("issues of constitutional law"); *Mindes v. Seaman, supra* ("errors of constitutional proportion"). Cf. *United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969).

976, 92 S.Ct. 1202, 31 L.Ed.2d 251 (1972). A conviction should be reversed, however, when the alleged error constitutes a "failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941).

Most habeas corpus cases have provided relief only where it has been established that errors of constitutional dimension have occurred. But the Supreme Court held in a recent decision that nonconstitutional errors of law can be raised in habeas corpus proceedings where "the claimed error of law was 'a fundamental defect which inherently results in a complete miscarriage of justice,' " and when the alleged error of law " 'present[ed] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.' " *Davis v. United States,* 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974), quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). Thus, an essential prerequisite of any court-martial error we are asked to review is that it present a substantial claim of constitutional dimension,[23] or that the error be so fundamental as to have resulted in a gross miscarriage of justice.

*2. The issue must be one of law rather than of disputed fact already determined by the military tribunals.* The second inquiry is whether the issue raised is basically a legal question, or whether resolution of the issue hinges on disputed issues of fact. This circuit said in *Gibbs v. Blackwell,* 5 Cir., 1965, 354

F.2d 469, 471, that "In reviewing military convictions, the courts must be on guard that they do not fail to perceive the difference between reviewing questions of fact and law. This is especially true at the constitutional level." Compare *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), where the review of matters resolved against a serviceman "on a factual basis by the court-martial which convicted him" was held to be beyond the proper scope of review. *Id.* at 760–761, 94 S.Ct. at 2564. The Court of Claims has noted that abstinence from reviewing court-martial proceedings need not necessarily be practiced "where the serviceman presents pure issues of constitutional law, unentangled with an appraisal of a special set of facts." *Shaw v. United States,* 1966, 357 F.2d 949, 953–954, 174 Ct.Cl. 899.[24] See *Burns v. Wilson, supra,* 346 U.S. at 142, 145, 146, 73 S.Ct. at 1049, 1050, 1051. Thus, a conclusion that a military prisoner's claim is one of law and not intertwined with disputed facts previously determined by the military is one important factor which favors broader review.

*3. Military considerations may warrant different treatment of constitutional claims.* The third inquiry is whether factors peculiar to the military or important military considerations require a different constitutional standard. Where a serviceman's assertion of constitutional rights has been determined by military tribunals, and they have concluded that the serviceman's position, if accepted, would have a foreseeable adverse effect on the military mission, federal courts should not substitute their

---

**23.** We emphasize that only substantial constitutional questions should be cognizable in habeas corpus proceedings. As Judge Friendly has commented in a different context, "Today it is the rare criminal appeal that does *not* involve a 'constitutional' claim," because there "has been a vast expansion of the claims of error in criminal cases for which a resourceful defense lawyer can find a constitutional basis." Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 156 (1970).

**24.** See also *Levy v. Parker, supra,* 478 F.2d at 783; *Allen v. Van Cantfort, supra,* 436 F.2d at 629; *Augenblick v. United States,* 1967, 377 F.2d 586, 593, 180 Ct.Cl. 131, rev'd on other grounds, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *Kennedy v. Commandant,* 10 Cir., 1967, 377 F.2d 339, 342. In *Whelchel v. McDonald,* 340 U.S. 122, 124, 71 S.Ct. 146, 148, 95 L.Ed. 141 (1950), the Supreme Court commented, "Any error that may be committed in evaluating the evidence tendered [in a court-martial proceeding] is beyond the reach of review by the civil courts."

judgment for that of the military courts. In this regard the Supreme Court stated in *Burns* that the law of civilian habeas corpus could not be assimilated to the law governing military habeas corpus because military law is *sui generis.* 346 U.S. at 139–140, 73 S.Ct. at 1047. This point was reemphasized in *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975):

> This Court repeatedly has recognized that, of necessity, "[m]ilitary law . . . is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1047, 97 L.Ed. 1508 (1953); *Parker v. Levy,* 417 U.S. 733, 744, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974).

*Id.* at 746, 95 S.Ct. at 1307. See also *Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974), where the Court noted that "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." The Supreme Court in *Burns* emphasized that "the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment." 346 U.S. at 140, 73 S.Ct. at 1048.[25] *Cf. Mindes v. Seaman, supra,*

where this circuit noted that one factor determining whether a federal court should review internal military affairs is the type and degree of anticipated interference with the military function and the extent to which military expertise and discretion are involved. 453 F.2d at 201–202. The importance of this policy was recently reiterated in *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). In that case, the Court reviewed the traditional deference allowed for rules and regulations within military society. See 417 U.S. at 743–744, 749–752, 756–759, 94 S.Ct. at 2555–2556, 2558–2560, 2562–2564. The armed forces' requirements of obedience and discipline, the Court stated, justified a less stringent standard of review for vagueness and overbreadth attacks on Army regulations. Even as to the First Amendment rights asserted by Captain Levy, the Court stated that "the different character of the military community and of the military mission require a different application of those [First Amendment] protections." *Parker v. Levy,* 417 U.S. at 758, 94 S.Ct. at 2563.[26] See also *Schlesinger v. Councilman, supra.*

There are other reasons why federal courts should not intervene in basically military matters. Congress, with its power to create and maintain the armed forces and to declare war, and the President, with his power as Commander-in-Chief, have great powers and responsibilities in military affairs.[27] Congress has

---

**25.** The great difference of military life makes exceedingly difficult the attempts by federal courts to perceive the proper contours of due process necessary in court-martial proceedings. No such problems confront federal courts when shaping the due process protections to be afforded defendants in state court proceedings, however, for, as Irving Brant states in The Bill of Rights 483 (1965), "the essential differences between state and federal criminal law, though immense in subject matter, have little bearing on 'fundamental fairness' or 'basic liberties.' These are involved when overlapping jurisdictions produce double jeopardy, but the fundamentals of fairness are not different in state and federal courts."

**26.** The Court stated in part, "His conduct, that of a commissioned officer publicly urging enlisted personnel to refuse to obey orders which might send them into combat, was unprotected under the most expansive notions of the First Amendment." 417 U.S. at 759, 94 S.Ct. at 2564.

**27.** "The Congress shall have Power . . . To make Rules for the Government and Regulation of the land and naval Forces . . . ." U.S.Const., Art. I, § 8. "The President shall be Commander in Chief of the Army and Navy of the United States . . . ." U.S.Const., Art. II, § 2.

a substantial role to play in defining the rights of military personnel, see *Burns, supra*, 346 U.S. at 140, 73 S.Ct. at 1048, and by enactment of the Uniform Code of Military Justice [28] and the Military Justice Act of 1968 [29] it has assumed that responsibility. See also *Schlesinger v. Councilman, supra*; *Hammond v. Lenfest*, 2 Cir., 1968, 398 F.2d 705, 710. A related reason is that an independent appellate court, the Court of Military Appeals composed of nonmilitary judges, has been established to review military convictions. That court has reaffirmed the fundamental premise that "the pro-

tections in the Bill of Rights, except those which are expressly or by necessary implication inapplicable, are available to members of our armed forces." *United States v. Jacoby*, 11 U.S.C.M.A. 428, 430–431, 29 C.M.R. 244 (1960); see also *United States v. Tempia*, 16 U.S.C.M.A. 629, 633, 37 C.M.R. 249 (1967); *United States v. Culp*, 14 U.S.C.M.A. 199, 33 C.M.R. 411 (1963); *Bishop, supra*, 61 Colum.L.Rev. at 56, 65–66. The Court of Military Appeals has, in many instances, extended the constitutional rights of servicemen beyond those accorded to civilians.[30] Safeguarding the serviceman's

**28.** Act of May 5, 1950, ch. 169, 64 Stat. 107, 10 U.S.C. §§ 801–940. In enacting the U.C.M.J., Congress extended to the military by statutory provision many of the explicit guarantees of the Bill of Rights. E. g., U.C.M.J. articles 31 (self-incrimination), 44 (former jeopardy), 46 (compulsory process), 55 (cruel or unusual punishment), 10 U.S.C. §§ 831, 844, 846, 855.

**29.** The Military Justice Act of 1968, Pub.L. 90–632, 82 Stat. 1336, 10 U.S.C. § 819; see Ervin, The Military Justice Act of 1968, 45 Mil.L.Rev. 77 (1969); Mounts & Sugarman, The Military Justice Act of 1968, 55 A.B.A.J. 470 (1969).

**30.** The following examples are illustrative: (1) the U.C.M.J. provides for liberal defense discovery of the prosecution's case. Article 32(b), 10 U.S.C. § 832(b), provides that defendants are to be provided with copies of the substance of all testimony obtained during investigations prior to bringing charges against the accused. "[T]he Code's provision for pretrial investigation gives the accused more valuable rights (especially the right to know the prosecution's case against him) than he would get if he were indicted by a civilian grand jury." J. Bishop, Justice Under Fire 140 (1974). (2) In order to curb delays in bringing confined defendants to trial, the Court of Military Appeals, in the exercise of its supervisory power, established a rebuttable presumption that a denial of the right to a speedy trial has occurred when pretrial detention exceeds three months. *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971). This presumption places a "heavy burden" on the prosecution to show diligence, and failure to sustain that burden results in dismissal of the charges against the accused. *United States v. Burton, supra*; *United States v. Marshall*, 22 U.S.C.M.A. 431, 47 C.M.R. 409 (1973). In *Dunlap v. Convening Authority*, 23 U.S.C.M.A. 135, 48 C.M.R. 751 (1974), this presumption was extended to *post-trial* confinements in excess of three months pending review of the

case by the convening authority. The United States Army command in Europe has adopted a rule requiring trials within 45 days of arrest. USAREUR Suppl. 2, Sept. 27, 1971, to Army Reg. No. 27–10. (3) Article 31 of the U.C.M.J., 10 U.S.C. § 831, prohibits self-incrimination. Because of the inherently coercive environment of the military command structure, more self-incrimination protections have been given accused servicemen than their civilian counterparts. See *United States v. Musguire*, 9 U.S.C.M.A. 67, 25 C.M.R. 329 (1958). While decisions by the Supreme Court have held that the self-incrimination protections of the Fifth Amendment do not apply to "nontestimonial" evidence such as handwriting samples, blood tests and voice identifications, e. g., *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the Court of Military Appeals has held that Article 31 protects defendant from being compelled to give such evidence. See *United States v. Musguire, supra*; *United States v. Minifield*, 9 U.S.C.M.A. 373, 26 C.M.R. 153 (1958); *United States v. White*, 17 U.S.M.C.A. 211, 38 C.M.R. 9 (1967); *United States v. Penn*, 18 U.S.C.M.A. 194, 39 C.M.R. 194 (1969). While statements obtained in violation of *Miranda* can be used to impeach defendants in state and federal criminal trials, *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Court of Military Appeals has held the use of such testimony impermissible in military trials. *United States v. Jordan*, 20 U.S.C.M.A. 614, 44 C.M.R. 44 (1971); *United States v. Lincoln*, 17 U.S.C.M.A. 330, 38 C.M.R. 128 (1967). For a more general discussion of these and other distinctions, see Moyer, Procedural Rights of the Military Accused: Advantages over a Civilian Defendant, 22 Maine L.Rev. 105 (1970); Quinn, Some Comparisons Between Courts-Martial and Civilian Practice, 15 U.C.L.A.L.Rev. 1240 (1968).

rights is frequently best left to a body with special knowledge of the military system. *Schlesinger v. Councilman, supra,* 420 U.S. at 757, 95 S.Ct. at 1313, 1314.

4. *The military courts must give adequate consideration to the issues involved and apply proper legal standards.* The fourth and final inquiry is whether the military courts have given adequate consideration to the issue raised in the habeas corpus proceeding, applying the proper legal standard to the issue. Decisions by reviewing courts within the military justice system must be given a healthy respect, particularly where the issue involves a determination of disputed issues of fact. But a necessary prerequisite is that the military courts apply a proper legal standard to disputed factual claims. See *S. E. C. v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). *Burns* requires that particular respect be given military decisions: "In military habeas corpus cases, even more than in state habeas corpus cases, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings—of the fair determinations of the military tribunals after all military remedies have been exhausted." 346 U.S. at 142, 73 S.Ct. at 1048–1049.

To summarize, the scope of review may be stated as follows:

Military court-martial convictions are subject to collateral review by federal civil courts on petitions for writs of habeas corpus where it is asserted that the court-martial acted without jurisdiction, or that substantial constitutional rights have been violated, or that exceptional circumstances have been presented which are so fundamentally defective as to result in a miscarriage of justice. Consideration by the military of such issues will not preclude judicial review for the military must accord to its personnel the protections of basic constitutional rights essential to a fair trial and the guarantee of due process of law. The scope of review for violations of constitutional rights, however, is more narrow than in civil cases. Thus federal courts should differentiate between questions of fact and law and review only questions of law which present substantial constitutional issues. Accordingly, they may not retry the facts or reevaluate the evidence, their function in this regard being limited to determining whether the military has fully and fairly considered contested factual issues. Moreover, military law is a jurisprudence which exists separate and apart from the law governing civilian society so that what is permissible within the military may be constitutionally impermissible outside it. Therefore, when the military courts have determined that factors peculiar to the military require a different application of constitutional standards, federal courts are reluctant to set aside such decisions.

With these principles in mind, we consider the additional issues raised by this appeal.

### III. Pretrial Publicity

Neither side disputes the magnitude of the publicity which surrounded this case:

---

The Court of Military Appeals has been criticized for being overly protective of servicemen's rights, to the prejudice of military discipline. E. g., Fratcher, Presidential Power to Regulate Military Justice: A Critical Study of Decisions of the Court of Military Appeals, 34 N.Y.U.L.Rev. 861 (1959); Westmoreland, Military Justice—A Commander's Viewpoint, 10 Am.Crim.L.Rev. 5 (1971). Another person involved in the military justice system on a day-to-day basis has commented, "During my year and a half as a military prosecutor, I have come to realize that the military criminal justice system is characterized by exacting fairness, frequently excessive leniency, and an ob-

sessive regard for the rights of the accused." Rehyansky, Military Law is to Law as . ., Juris Doctor, Dec. 1974, p. 15.
See also *Schlesinger v. Councilman, supra,* 420 U.S. at 758, 95 S.Ct. at 1313; *Id.* at 765 n. 3, 95 S.Ct. 1316 n. 3 (Brennan, J., dissenting); J. Bishop, Justice Under Fire 137 (1974); *Bishop, supra,* 61 Colum.L.Rev. at 56–57 & n. 87; Quinn, Some Comparisons Between Courts-Martial and Civilian Practice, 15 U.C.L.A.L. Rev. 1240 (1968); Note, *supra,* 76 Yale L.J. at 389–390; Note, *supra,* 69 Colum.L.Rev. at 1265; Note, The Court of Military Appeals and the Bill of Rights: A New Look, 36 Geo.Wash. L.Rev. 435 (1967).

204

the original record contains volumes of clippings, reports and extracts from written reports on the case, as well as video tapes of certain televised broadcasts and programs. No factors peculiar to military life or important military considerations have been asserted to justify a departure from the standards and requisites established by Supreme Court decisions.

In the past two and one-half decades, the Supreme Court has handed down a number of decisions discussing and balancing the conflicts created when there exists the possibility that the press may have jeopardized the important right of a defendant to a fair trial.[31] The primary problem here is that a court member who has had substantial contact with reports and stories concerning the defendant whose fate he will decide, may make his decision based on information gathered outside the courtroom. An important prerequisite of a fair and impartial trial "is the requirement that the jury's verdict be based on evidence received in open court, not from outside sources." *Sheppard v. Maxwell,* 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966); see *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1970). The general rule is that a defendant has the burden on appeal of proving actual jury prejudice if a conviction is to be reversed on grounds of prejudicial publicity. *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6

L.Ed.2d 751 (1961); *Reynolds v. United States,* 98 U.S. 145, 156–157, 25 L.Ed. 244 (1879).[32] Other Supreme Court decisions[33] have reversed convictions and dispensed with the requirement of showing actual prejudice in the jury box in extreme circumstances where there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable. See *Estes v. Texas,* 381 U.S. 532, 542–543, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543 (1966).

The Supreme Court has noted that generalizations are not helpful, and that "each case must turn on its special facts." *Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959); see *United States v. Schrimsher,* 5 Cir., 1974, 493 F.2d 848, 854; *Gordon v. United States,* 5 Cir., 1971, 438 F.2d 858, 873, cert. denied, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 77; *Hale v. United States,* 5 Cir., 1970, 435 F.2d 737, 746, cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). Additionally, we must review the merits of the prejudicial publicity claim. *Sheppard v. Maxwell, supra,* 384 U.S. at 362, 86 S.Ct. at 1522; *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643; *Hale v. United States, supra,* 435 F.2d at 746; *Gawne v. United States,* 9 Cir., 1969, 409 F.2d 1399, 1401, cert. denied, 397 U.S. 943, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970); *Margoles v. United States,* 7 Cir., 1969, 407 F.2d 727, 730–731, cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84.

31. See *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *Stroble v. California,* 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952).

32. The traditional rule in such cases has been that there must exist a nexus between community prejudice and jury prejudice; there

must be a showing that "prejudice found its way into the jury box." *Pamplin v. Mason,* 364 F.2d 1, 5 (5 Cir. 1966).

*Hale v. United States,* 5 Cir., 1970, 435 F.2d 737, 746, cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

33. See *Sheppard v. Maxwell, supra; Estes v. Texas, supra; Rideau v. Louisiana, supra; Marshall v. United States, supra;* see also *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), and *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (improper contact with or influence on jurors during trial.)

### The Merits of the Pretrial Publicity Issue

There is no contention here that publicity has been a driving force behind the securing of an indictment—that publicity has initiated the prosecution.[34] As the district court noted, though Calley was charged on September 5, 1969, for the murder of civilians at My Lai, there was little or no publicity surrounding the charges or the My Lai incident until mid-November of the same year. Moreover, Calley's trial was conducted with restraint and dignity, and there is no assertion that the court members, though not sequestered, had any contact with the massive publicity spawned by the trial itself.[35] Thus, our focus is on the post-indictment, pretrial publicity and its impact on petitioner's trial.

### A. The District Court's View

The district judge concluded that Calley had been persecuted and pilloried by news media so intent on making prejudicial revelations about the incident that Calley's right to a fair and unbiased hearing was impossible. The court's review led it to conclude that the publicity was clearly improper, largely biased and undoubtedly prejudicial.[36] The district judge concluded that "it was not humanly possible for the jurors not to be improperly influenced by prior exposure," that "[n]o person, however honest minded he might try to be, could avoid the lasting emotional impact" of some of the publicity, and that, with all the publicity given the incident, "it would be sheer fantasy to believe that the jurors did not see, hear and read [the publicity] or that

they were not influenced by it." 382 F.Supp. at 685, 672, 686. These findings led the court to hold the publicity inherently prejudicial to Calley's Sixth Amendment rights. The court also found "isolatable prejudice" in the fact that one court member stated during *voir dire* that he had seen Captain Medina on television at one time, and that Medina had appeared credible and straightforward. 382 F.Supp. at 690. We hold that the trial court's findings of inherent and actual prejudice are erroneous, and conclude that pretrial publicity did not deprive Calley of a fair trial.

### B. Inherent Prejudice

■■■ The district court emphasized that the case involved "massive" and "intense" publicity. Yet this court has noted previously that "[w]e cannot accept the position that 'prominence brings prejudice.'" *Hale v. United States, supra*, 435 F.2d at 747. Moreover, no court has held that the only impartial juror is an uninformed one. We cannot expect jurors to live in isolation from the events and news of concern to the community in which they live.

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that

---

**34.** Compare *Sheppard v. Maxwell, supra,* where newspaper headlines asked "Why Isn't Sam Sheppard in Jail?" and urged "Quit Stalling—Bring Him In" until Sheppard was later arrested and indicted.

**35.** Compare *Sheppard v. Maxwell, supra; Estes v. Texas, supra; Parker v. Gladden, supra; Turner v. Louisiana, supra; Marshall v. United States, supra; United States v. Rattenni,* 2 Cir., 1973, 480 F.2d 195.

**36.** The press did little right, in the district judge's view. ABC television was criticized

for its broadcast of November 18, 1969, because an interview conducted in front of a map of Vietnam "on which blotches of blood appeared, obviously . . . accentuate[ed] the horror of the story." 382 F.Supp. at 659. Two days later, CBS–TV broadcast some pictures of the massacre, and was castigated by the court because "to increase the shock effect of the display there was absolute silence while the pictures were on the TV screen." *Id.* at 660.

the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd, supra,* 366 U.S. at 722–723, 81 S.Ct. at 1642–1643.

Our review discloses that some of the publicity is favorable to Lieutenant Calley. The record discloses reports of rallies in his behalf, campaigns to have the Army drop charges against him, and efforts to raise funds for his defense. One newspaper clipping describes Calley's appearance before cheering American Legionnaires at Columbus, Georgia, to receive a contribution to defray the costs of his defense. The clippings substantiate the observation of the Court of Military Review that at the situs of the court-martial, Fort Benning and neighboring Columbus, Georgia, "there were indications that the climate was somewhat favorable to Lieutenant Calley." At the very least, these reports indicate that, unlike the situation in *Sheppard v. Maxwell,* Calley was not being tried in an atmosphere of hostility and persecution. Also ignored by the lower court was the fact that a good deal of the extensive publicity surrounding the incident did not contain virulent and oppressive attacks on Calley, but rather objective statements of the facts known and discovered about the My Lai incident or the more general topic of the conduct of the war in Vietnam. A prejudicial publicity claim must be viewed differently when the news accounts complained of are "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." *Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962); see *Gordon v. United States,* 5 Cir., 1971, 438 F.2d 858, 873 & n. 48. We cannot, therefore, agree with the district judge that the total effect of the publicity in this case "was to convict the Petitioner as surely as if he had confessed on the television screen." 382 F.Supp. at 683.

The effect of the publicity on the American public in general is of course uncertain, but material contained in the record belies the district court's conclusion that anyone familiar with the news reports surrounding the My Lai massacre would automatically convict Calley. *Time* magazine was severely castigated by him for its role in the publicity. But a survey conducted for and published by *Time* in the first week of January 1970 (when the publicity was at its peak) reached the conclusion that there was "considerable sympathy" for Lieutenant Calley among the people interviewed. "By a margin of 55 percent to 23 percent, they believe Calley is being made a scapegoat by the Government"; also, that most people were disturbed over the publicity given the alleged massacre. Sixty-seven percent of those polled "believe that the press and TV should not have reported statements by soldiers involved prior to a trial." The results of a Harris Poll published January 8, 1970 showed that 66 per cent of the public felt that soldiers killing even civilians should not be court-martialed if they did so under orders. These polls and figures are, of course, not directly relevant to a determination of whether the panel which ultimately convicted Calley was influenced by such publicity. We mention the above material only to emphasize that the district judge overlooked important aspects of the record in reaching his conclusions, and to note that there appears to have been no single sentiment regarding the case held by a vast segment of the American public.

█ The critical issue is the actual or probable effect of the pretrial publicity on the trial itself and, more precisely, on those who sat in judgment of Calley. A careful review of the exhaustive *voir dire* conducted at trial indicates that there is no likelihood that pretrial publicity prejudiced Lieutenant Calley such as to deny him a fair trial. An important

concern in all prejudicial publicity cases is whether the publicity has led prospective jurors to hold preconceived notions of the defendant's guilt. Two prospective court members felt that the charges against Calley had some substance. Captain Cooch stated that his initial reaction to the charges was that "somebody was getting railroaded." But since the Army had adhered to its charges after the Peers Commission report,[37] he believed there was substance to the charges and did not believe Calley was innocent. A defense challenge for cause was granted. Captain Cox also stated he believed there was some truth to the charges against Calley or the Army would not have pursued the prosecution. A defense challenge for cause was also granted.

On the other hand, four prospective court members were dismissed from the panel because they held views so sympathetic to Lieutenant Calley that they could not objectively judge the case. Major Ehrhardt, a prospective court member, had expressed the firm opinion that the Government had been wrong in bringing charges against Calley.[38] A Government challenge for cause was granted. Captain Gully also had expressed an opinion that the Government was incorrect in proceeding against Calley. Captain Gully stated that he had heard of similar incidents concerning the killing of civilians in Vietnam which had not resulted in prosecution of anyone, and stated that this plus other informa-

tion known to him would make it difficult to make a decision based solely on information presented in court. A Government challenge for cause was granted. Captain Lum had stated that a prosecution was "pretty bad" when "the man gets charged for killing civilians or otherwise, not knowing whether the village was secured. . . . If it's just outright murder, it's different but to enter a village that was supposed to have been controlled by Viet Cong and being involved in something like this . . ." A challenge for cause was granted.[39] Lieutenant Colonel Stith was one of the few persons who said his views had been influenced by publicity to the extent that he felt it would be impossible to put the things he had read from his mind. The impact of the publicity, however, was to prejudice Lieutenant Colonel Stith against the prosecution. The Government's challenge for cause was granted.

Of the court members selected, none stated that he had formed an opinion as to the guilt or innocence of Calley. All court members stated that their decision would not be influenced by any of the publicity with which they had been in contact. The district judge dismissed these statements, made under oath and after extensive questioning by all parties, as being largely meaningless. See 382 F.Supp. at 685. Given the presumption that court members will be impartial, we think the district court should not have dismissed these statements so

**37.** The Peers Report was the result of the inquiry officially designated as "The Department of Army Review of the Preliminary Investigations into the My Lai Incident." The inquiry panel was headed by Lieutenant General William R. Peers, and its purpose was to determine whether the original Army investigations into the My Lai incident were adequate and whether there had been any suppression of information connected with them.

**38.** Major Ehrhardt stated his views as follows:

I have been in combat, not only in Vietnam but also in Korea and know the stress and strain that is on the man on the ground having to make decisions and also being in Vietnam and being with the Vietnamese, I

have seen some things that the Viet Cong have done to people that they are supposed to be liberating and you can't tell in Vietnam whether the man sitting down at the table with you, if he is Vietnamese, whether he is friendly or the enemy and at that time, this was before the full investigation and everything, I made the statement that I thought the Army, at that time, was making a mistake.
Tr. at 636.

**39.** It must be noted that the defense also challenged Captain Lum because he indicated a reluctance to strictly follow the instructions of the court.

lightly. The district court cited *Irvin v. Dowd* as support for its conclusion that the court members' statements need not be accepted at face value. But *Irvin v. Dowd* involved a situation where, on *voir dire*, "almost 90% of those [prospective jurors] examined on the point . . . entertained some opinion as to guilt— ranging in intensity from mere suspicion to absolute certainty." 366 U.S. at 727, 81 S.Ct. at 1645. Indeed, 8 of the 12 jurors in that case thought Irvin was guilty before they were placed on the jury. Such facts cannot be fairly compared to the integrity of the court members in the present case where none of those seated expressed any opinions as to guilt.

█ Two factors in particular give support to the credibility of the court members' claims that they would reach a verdict unimpressed by pretrial publicity. The first is the long period of time between the peak of the publicity and the beginning of the trial. The publicity surrounding My Lai and Calley's trial was at its peak during November and December of 1969 and January of 1970. Very little new information was thereafter brought to light, and the publicity subsided substantially.[40] The court members were not selected and the trial begun until November 1970. The military judge had delayed the trial in part to aid in empanelling an impartial court; he felt that the publicity had dissipated and that the court members selected were impartial and untainted by publicity.[41] *Sheppard v. Maxwell* states that "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial," "continu[ing] the case until the threat abates" is one means of assuring a fair trial. 384 U.S. at 363, 86 S.Ct. at 1522. We agree with the statement of the court in *Wansley v. Slayton*, 4 Cir., 1973, 487 F.2d 90, 93–94, *cert. denied*, 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974), that "recency is a critical factor to be considered in connection with any claim of pre-trial prejudicial publicity." In addition to the long time lapse of little publicity prior to trial, there was the period of over four months during trial in which it is undisputed that no improper influences were brought to bear on the court members. Where there has been a substantial lapse of time between the publicity and the trial, there is a far lesser likelihood the publicity will affect the juror's deliberations. See, e. g., *Beck v. Washington*, *supra* (nine and one-half months sufficient time for impact of prejudicial publicity to subside); *United States ex rel. Rosenberg v. Mancusi*, 2 Cir., 1971, 445 F.2d 613, 617–618, *cert. denied*, 405 U.S. 956, 92 S.Ct. 1186, 31 L.Ed.2d 234 (1972) (eight months between crime and trial); *United States v. Bowe*, 2 Cir., 1966, 360 F.2d 1, 11–12, *cert. denied*, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (adverse publicity appeared "several months" prior to trial).

█ The second reason to credit the court members' statements is that they were the product of searching and sensitively conducted *voir dire*. The military judge conducted the *voir dire* in accordance with the recommendations of the American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free

---

**40.** This fact is indicated by the district court's opinion, in which only two of the approximately fifty news accounts which were specifically referred to occurred after January 1970. A great part of the publicity mentioned was published or broadcast from mid-November to early December of 1969.

**41.** The military judge stated:

The voir dire has now been completed, and I'm satisfied that any potential adverse effect of the pretrial publicity has been dissipated by the very delay in this case, and, of course, that is the reason I delayed the trial of this case as long as I did, that is, to let the effect of any pretrial publicity dissipate, and I am satisfied that the selected jurors aren't tainted by the publicity and will decide this case solely on the evidence that they hear presented in open court, and follow the law that I will give them following the presentation of the evidence.
Tr. at 918.

Press 3.4(a) (Approved Draft, 1968).[42] The examination of each court member was held out of the presence of other prospective jurors.[43] Judge Kennedy, the military judge, himself inquired into the prospective court members' exposure to publicity and ability to render a fair and impartial verdict. But more importantly, both defense counsel and the prosecution were allowed almost unlimited freedom to inquire into the court members' attitudes, perceptions, backgrounds and the nature and extent of their exposure to pretrial publicity.[44] Counsel were provided with the Army's personnel files on the prospective court members. The result was that the record fully reflects the possible biases of all potential court members. The fact that after meticulous questioning none of the prospective court members was shown to hold preconceived notions of guilt or innocence or to be unable to adjudge Calley free of outside influences requires great deference to the military judge's conclusion that a fair and impartial jury had been empaneled. Our own review of the *voir dire* (which consumed five days and created almost 400 single-spaced, legal-sized pages of record to select six court members) convinces us that there was no substantial likelihood that the court members selected were other than fair and impartial individuals who would determine Calley's guilt or innocence based solely on the evidence developed before the court.[45] The district judge assumed that exposure to publicity alone made it impossible for the court members not to be improperly influenced. See 382 F.Supp. at 684–686. There have been a few cases which have equated pretrial exposure with prejudice,[46] but this is not such a case. See *Murphy v. Florida*, 421 U.S. 794, 800 & 4, 95 S.Ct. 2031, 2036 & n. 4, 44 L. Ed.2d 589 (1975).

There are other reasons why this is not a case that has close parallels

42. 3.4 Selecting the jury.

It is recommended that the following standards be adopted in each jurisdiction to govern the selection of a jury in those criminal cases in which questions of possible prejudice are raised.

(a) Method of examination.

Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept, by court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have.

43. Compare *Irvin v. Dowd, supra,* where the Supreme Court disapproved of conducting an examination to determine prejudice in the presence of the other veniremen. See 366 U.S. at 728, 81 S.Ct. at 1645.

44. Compare *United States v. Dellinger,* 7 Cir., 1972, 472 F.2d 340, 373–377, *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), where the trial court's failure to make inquiries during *voir dire* "adequate to determine whether anyone has read or heard about the facts, and, if so, what the impact has been on his ability to serve as an impartial juror" constituted reversible error.

45. There has been a greater willingness to uphold a trial court's determination that jurors were capable of rendering an impartial verdict where that conclusion was reached after deliberate, searching, and thorough *voir dire.* Compare *United States v. Budzanowski,* 3 Cir., 1972, 462 F.2d 443, 453–454, *cert. denied,* 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220; *Tasby v. United States,* 8 Cir., 1971, 451 F.2d 391, 394, *cert. denied,* 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972); *United States v. Addonizio,* 3 Cir., 1971, 451 F.2d 49, 66–67, *cert. denied,* 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972); *Rees v. Payton,* 4 Cir., 1965, 341 F.2d 859, 863–864 (*en banc*); *Estes v. United States,* 5 Cir., 1964, 335 F.2d 609, 614–615, *cert. denied,* 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559; *United States v. Bando,* 2 Cir., 1957, 244 F.2d 833, 838, *cert. denied,* 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53, with *United States v. Dellinger, supra; Silverthorne v. United States,* 9 Cir., 1968, 400 F.2d 627, 637–638; *Coppedge v. United States,* 1959, 106 U.S.App.D.C. 275, 272 F.2d 504, 507–508, *cert. denied,* 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961).

46. E. g., *Rideau v. Louisiana supra.* In *Estes v. Texas, supra,* the televising of court proceedings was deemed so likely to create prejudice that prejudice was assumed.

in previous free press-fair trial litigation. The district judge was concerned that any court member who had any knowledge of the facts surrounding this case or any familiarity with the principal figures in the case would be unable to render a fair decision. Yet a concerted effort was made by the defense to have placed on the panel officers who had knowledge of many aspects of this case. The defense at one time objected to the *voir dire* panel, claiming inadequate representation of officers who had served as platoon leaders in combat in Vietnam. The apparent goal was to have as court members officers who had been in combat, who knew the stresses of the "dirty little war" in Vietnam, who understood the need for unquestioning obedience to orders, who understood that there was no clear distinction between friend and foe in Southeast Asia, and who were aware of the horrors of any war. All six court members in Calley's trial had combat experience, and five had served in Vietnam. Some court members knew or had heard of atrocities in Vietnam committed by the Viet Cong or others. Captain Salem, like Calley, had served in Vietnam as a platoon leader after obtaining his commission through Officer's Candidate School. He had operated in a free fire zone, and stated that it was his impression that a person would have to be berserk to kill over 100 people even in a combat situation; Salem was seated on the jury over prosecution objection. Major McIntosh had combat experience, and had been subjected to terrorist attacks. McIntosh had received two Silver Stars, and had been wounded four times; he said he felt it was the duty of a soldier to obey any and all orders. Major Bierbaum had been fired on in combat during his two tours in Vietnam; his belief was that all orders are presumed to be legal. Captain Brown had served two tours in Vietnam; he had received his commission through O.C.S. after seven years as an enlisted man. He had combat experience, had captured enemy suspects, and had heard of Viet Cong atrocities. Major Kinard also had received an O.C.S.

commission, after nine years' service as an enlisted man. In his two tours of Vietnam he had received a Bronze Star and a Silver Star. Major Kinard had combat experience, and had heard of hostile acts by women, old men and children. He stated he would treat the Viet Cong and their sympathizers in the same way. In short, a major goal of the defense was to have on the court-martial officers familiar with the killing, the stress, and the inhumanity of ground combat in Vietnam, and this goal was achieved. To contend that these same men, whose familiarity with circumstances relevant to the case was desired by the defense, should be disqualified merely because they had heard or read news reports regarding this incident is to ignore the reality of Calley's trial. The district court's conclusion that mere exposure to publicity necessarily prevented any person from serving as a juror has an extremely unsettling sidelight. If, in this age of instant, mass communication, we were to automatically disqualify persons who have heard about an alleged crime from serving as a juror, the inevitable result would be that truly heinous or notorious acts will go unpunished. The law does not prohibit the informed citizen from participating in the affairs of justice. In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system of justice. Cf. *Mares v. United States,* 10 Cir., 1967, 383 F.2d 805, 808.

### C. Actual Prejudice

We have also reviewed the contention that actual, isolatable prejudice due to publicity has been demonstrated. Defense counsel challenged court member Colonel Ford for cause on the basis of "exposure to news accounts which, in my mind, cannot be erased from his mind and it would substantially influence him on the findings." Tr. at 585. Yet Colonel Ford had received orders almost a year prior to trial, on November 26, 1969, to refrain from any exposure to news accounts regarding the My Lai in-

cident. He followed that order, stating that when he heard news flashes on the subject he left the room, and when he saw headlines on the subject, he read no further. Thus, Colonel Ford's only exposure to publicity was almost a year prior to trial. He stated he was unfamiliar with the facts of the case, and had no opinion of the guilt or innocence of the defendant. Under the circumstances, we believe there was no reason to believe publicity had any improper impact on Colonel Ford.

Captain Brown, a court member, was challenged for cause by the defense "merely on the basis of the information he's heard from outside sources, such as, periodicals, news media and those others." Brown stated that though he had been in contact with some publicity, nothing had made any lasting impression on him. He stated that he had heard about the incident on radio and TV, "but since then, since the initial outbreak on it, I haven't paid any attention to it." He stated that he would make his decision in the case based solely on the evidence presented in the courtroom. Captain Brown had expressed no prior opinion on the circumstances surrounding the prosecution of Calley. Although he had heard only indirectly of comments on the case by the President and others, he stated that this would not affect or influence him. We believe the military trial judge did not err in refusing to grant the defense challenge.

The court member of most concern to the district judge was Major McIntosh. McIntosh had been exposed to magazine and newspaper accounts, and had seen some of the daily TV news reports. He stated that he had been unaffected by this exposure. Major McIntosh stated that he had seen Captain Medina on television, and that Medina had seemed credible. We have quoted this entire exchange between Major McIntosh and defense counsel on this subject below.[47] Major McIntosh stated that the interview had not affected his opinion of the accused, that he had not formed an opinion as to Captain Medina's credibility, and that his opinion as to Medina's credibility would be based solely on Medina's appearance in the courtroom. The defense did not challenge Major McIntosh. The defense had an opportunity to assess whether Major McIntosh would be influenced by an event they were allowed fully to explore, and counsel apparently concluded, in light of McIntosh's responses, that he had not been influenced by publicity so as to be unable to fairly try his client. The fact that no challenge was raised "is strong evidence that he was convinced

47. Q Did you hear Captain Medina on the TV?

A On one occasion, yes.

Q And involved in that appearance was there some statements made by him as to what he may have done or may not have done?

A I don't recall the contents of the interview. I don't even remember where it took place but it was with a newscaster but I don't recall what the contents of the interview was.

Q Was there anything so impressive about Captain Medina that would affect you one way or the other against the accused?

A No, other than the fact that he appeared to answer his questions by the interviewer straight forward. That's the only thing that impressed me.

Q If it came to a question of credibility as between two officers, would that appearance and the impressiveness, if he was impressive, have any impact on you to that appearance on the TV?

A He seemed credible, yes.

Q Did you form an opinion of his credibility at that time?

A No.

Q Then, I will ask you, would you, while you feel he was very credible on that occasion, would you take that into account or would you limit your feelings to the credibility as he appears in the courtroom, if he appears?

A I would limit it to that.

Q To what occurred in the courtroom as to credibility without reference to what you saw on TV?

A No. I would evaluate just exactly what he presented to the court.

Q And you would forget about his TV impressions?

A Yes, sir.

the juror [was] not biased and had not formed any opinion as to his guilt." *Beck v. Washington, supra,* 369 U.S. at 558, 82 S.Ct. at 964. We are convinced that McIntosh satisfied the impartial juror test set forth in *Irvin v. Dowd, supra.* See *Hale v. United States, supra,* 435 F.2d at 746.

### D. Control of the Media by the Military Court

■ Throughout the district court opinion, it is stated that because the military judge "could not control the witnesses nor the news media," 382 F.Supp. at 691, the court was unable to preserve Calley's right to a fair trial. See *Id.* at 657–658, 682–683, 691–692. But "there could be no constitutional infirmity in [the trial court's] rulings if petitioner actually received a trial by an impartial jury." *Beck v. Washington, supra,* 369 U.S. at 556, 82 S.Ct. at 963.

It is not disputed that the military court used most of the means suggested by *Sheppard v. Maxwell* to ameliorate potential prejudice stemming from publicity. The court delayed the proceedings to allow publicity to abate, it allowed extensive *voir dire* examination to probe for any possible influence on the court members by the publicity. The court successfully took great pains to insure that no publicity reached the court members during the trial.[48] Moreover, the court issued an order to all prospective witnesses, civilian and military, prohibiting disclosure of their prospective testimony. The military court refused, however, the defense request

> to restrain the three major television networks, certain named daily newspapers, news magazines and wire services, as well as "all radio and television networks and stations, newswire services, newspapers, and magazines operating or otherwise doing business in the United States of America, or any territory thereof", from publishing the

statements of any witness to the events giving rise to the charges against Lieutenant Calley, or any photographs, sketches, or other pictorial reproductions purporting to represent the bodies of persons allegedly killed in the village of My Lai 4, Republic of Vietnam on March 16, 1968, . . . until the first witness testifies on the merits, at the contemplated trial.

*United States v. Calley,* 19 U.S.C.M.A. 96, 41 C.M.R. 96 (Memorandum opinion December 2, 1969).

In all likelihood it would have been unconstitutional for the court to grant the defense request. In *United States v. Dickinson,* 5 Cir., 1972, 465 F.2d 496, *cert. denied,* 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223 (1973), this court undertook a lengthy analysis of the "civil libertarian's nightmare"—the prospect that a free press could destroy the right to a fair trial. We noted the general reluctance to expand the courts' power over the reporting of trials, and said that any control over the "content of news reports" would create "grave reservations whether such a limitation could be promulgated without making impermissibly serious inroads into the purview of the First Amendment." 465 F.2d at 506. In *Times-Picayune Publishing Corp. v. Schulingkamp,* 419 U.S. 1301, 95 S.Ct. 1, 42 L.Ed.2d 17 (1974), a Louisiana state court entered an order barring the publication of certain information concerning the trial of a black defendant for the rape-murder of a white girl. The restrictions were "aimed at the content of news reporting," 419 U.S. at 1306, 95 S.Ct. at 4, and included bans on publishing interviews with witnesses or any possible confessions or inculpatory statements. Mr. Justice Powell, as Circuit Justice, wrote:

> The court's order imposes significant prior restraints on media publication. As such, it would come to this Court "bearing a heavy presumption against

---

**48.** The trial court offered to sequester the court members throughout the trial, but the defense said this was unnecessary. The members were sequestered, however, throughout the almost two weeks of deliberation.

its constitutional validity." (citations omitted) 419 U.S. at 1307, 95 S.Ct. at 4. Justice Powell doubted that the order "would withstand the limitations that this Court has applied in determining the propriety of prior restraints on publication," 419 U.S. at 1308, 95 S.Ct. at 5, and stayed the order to the extent it imposed direct limitations on media reporting.

■ The military court should not be criticized for refusing to do what was in all probability constitutionally impermissible—controlling or imposing prior restraints on the news media. See *New York Times v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). The three most important reports on the free press-fair trial dilemma have all stated that courts should avoid direct influence over the newsmen's domain

while protecting defendants' rights to a fair trial.[49] Thus, we find no error in the actions taken by the military court which were fully consistent with the requirements of the Sixth Amendment and the limitations of the First Amendment.

We conclude, therefore, that petitioner Calley was not deprived of a fair trial by prejudicial pretrial publicity.

## IV. Compulsory Process

■ Prior to trial, defense counsel sought unsuccessfully to have subpoenaed the following persons: Secretary of Defense Melvin R. Laird, Secretary of the Army Stanley R. Resor, and Chief of Staff of the Army William Westmoreland. The defense stated that these individuals were essential to establish Calley's defense that all charges against him should be dismissed because "command influence and control had permeated the processing of the charges against the Petitioner."[50] The military judge

---

**49.** The Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue (Kaufman Committee), 45 F.R.D. 391 (1968) commented:

> The Committee does not presently recommend any direct curb or restraint on publication by the press of potentially prejudicial material. Such a curb, it feels, is both unwise as a matter of policy and poses serious constitutional problems.

*Id.* at 401–402. The report of the Special Committee on Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York, Freedom of the Press and Fair Trial (1967) (the Medina Report), concludes that "as a matter of both constitutional law and policy, . . . extension of the contempt power is neither feasible nor wise." *Id.* at 11. The American Bar Association Standards Relating to Fair Trial and Free Press (the Reardon Report) states that "the Committee is opposed to expanded use of [the contempt] power, both because of the constitutional problems that would be raised and because of the inhibitory effect on speech that ought not to be prohibited." *Id.* at 27 (Approved Draft, 1968).

**50.** The request that General Westmoreland be subpoenaed was also indirectly relevant to Calley's assertion that the former Chief of Staff had a personal interest in the outcome of the case. It was contended that if Westmoreland had such an interest in the case, he was

an accuser within the meaning of Article 1(9) of the U.C.M.J., 10 U.S.C. § 801(9). It was also contended that the commanding officer of Fort Benning, Major General Talbott, had no statutory authority to convene the court-martial because his superior, General Westmoreland, was an accuser. See Art. 22(b), U.C.M.J., 10 U.S.C. § 822(b). However, even assuming that General Westmoreland was an accuser, the alleged defect in the court-martial was not of jurisdictional dimension, because the interest of the superior officer did not affect the legal power or statutory authorization of the military to try Calley for what were clearly service-connected offenses. See *United States v. Gordon*, 1 U.S.C.M.A. 255, 2 C.M.R. 161 (1952) (Brosman, J., specially concurring); *United States v. Ferguson*, 5 U.S.C.M.A. 68, 79–83, 17 C.M.R. 68 (1954); *Brookins v. Collins*, 23 U.S.C.M.A. 216, 49 C.M.R. 5 (1974). As the Court of Military Review concluded, General Talbott was not incapacitated from convening the court-martial even if General Westmoreland was a statutory accuser. See 46 C.M.R. at 1149–1151. See also *Denton v. United States*, Ct.Cl.1959, 144 Ct.Cl. 840, *cert. denied*, 361 U.S. 821, 80 S.Ct. 70, 4 L.Ed.2d 68, where a failure to constitute a general court-martial in strict accordance with Article of War 8, now U.C.M.J. Art. 22(b), the provision relied on by petitioner, was held to be a defect which was formal and technical only, and not one which deprived the court-martial of jurisdiction. Moreover, the allegation that General

declined to require the appearance of these witnesses. The district court held that the failure to compel the attendance of these witnesses deprived petitioner of his Sixth Amendment right "to have compulsory process for obtaining witnesses in his favor . . . ." We conclude, however, that the district court's holding was erroneous and exceeded the proper scope of review for reasons we shall articulate.

The Court of Military Appeals has said that "In the nature of things, command control is scarcely ever apparent on the face of the record . . . ." *United States v. DuBay,* 17 U.S.C.M.A. 147, 149, 37 C.M.R. 411 (1967). Nonetheless, the Court has held that it is a "cardinal principle of military law" that the specter of command influence should not invade the decision of a military court. *United States v. Whitley,* 5 U.S.C.M.A. 786, 791, 19 C.M.R. 82 (1955). This has led the Court of Military Appeals consistently to hold that "any circumstance which gives even the appearance of improperly influencing the court-martial proceedings against the accused must be condemned." *United States v. Hawthorne,* 7 U.S.C.M.A. 293, 297, 22 C.M.R. 83 (1956). Thus, even in the absence of specific regulations or statutes, the Court

has set aside convictions where the proceeding has even the appearance of being tainted by improper command influence. See *United States v. Hedges,* 11 U.S.C.M.A. 642, 29 C.M.R. 458 (1960); *Generous, supra,* at 84–85; cf. *United States v. Walters,* 4 U.S.C.M.A. 617, 630, 6 C.M.R. 191 (1954). As Dr. Generous has noted, "Whenever that court [the Court of Military Appeals] even suspects command tampering, it reverses." *Generous, supra,* at 200.

Most charges of command influence relate to attempts by superior officers to influence the court's decision as to the guilt or innocence and punishment of the accused.[51] This is not, however, the contention raised here. Rather, it is that Calley was charged "in order to insulate higher-ups . . . ." If, as counsel alleged, the charges were coerced, or unauthorized influence was utilized in having the allegations against Calley brought to trial, such activity would, in all likelihood, have violated Art. 37 of the U.C.M.J., 10 U.S.C. § 837, which makes unlawful the use of any influence on the action of the convening authority.[52] But even if Calley had been unable to establish a violation of Art. 37, should he have been able to persuade the military court that there was a reasona-

Westmoreland was an accuser was a factual premise which neither the trial court nor the reviewing courts accepted. Cf. *Swaim v. United States,* 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897), where the President, after accusations against General Swaim were received by him, appointed a court of inquiry to investigate the accusations. Later, the President appointed a general court-martial to try General Swaim. The Supreme Court held "wholly unfounded" the contention that the President was thus an accuser or prosecutor, and commented, "It cannot be seen how these routine orders which led to the trial of the appellant can be construed as making the president his accuser or prosecutor." 165 U.S. at 558–559, 17 S.Ct. at 450.

**51.** In addition to the cases cited in the text, see *United States v. Fraser,* 15 U.S.C.M.A. 28, 34 C.M.R. 474 (1964); *United States v. Donati,* 14 U.S.C.M.A. 235, 34 C.M.R. 15 (1963); *United States v. Kitchens,* 12 U.S.C.M.A. 589, 31 C.M.R. 175 (1961); *United States v. Coffield,* 10 U.S.C.M.A. 77, 27 C.M.R. 151 (1958); *United States v. Lackey,* 8 U.S.C.M.A. 718, 25

C.M.R. 222 (1958); *United States v. Sears,* 6 U.S.C.M.A. 661, 20 C.M.R. 377 (1956); *United States v. Luttrice,* 3 U.S.C.M.A. 487, 13 C.M.R. 43 (1953); *United States v. Gordon,* 1 U.S.C.M.A. 255, 2 C.M.R. 161 (1952).

**52.** Article 37(a) of the U.C.M.J., 10 U.S.C. § 837(a), provides in part:

(a) No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

ble possibility that command influence had triggered the accusations against him, the charges could have been dismissed by the court pursuant to its supervisory obligation to do everything possible to eliminate command influence from the court-martial system. Cf. *United States v. Gordon,* 1 U.S.C.M.A. 255, 2 C.M.R. 161 (1952).

Calley's accusations that command influence was involved in bringing charges against him, and that he was being singled out as the Army's scapegoat, were based on speculations to this effect in news articles. The military prosecutor objected that such unconfirmed reports were an insufficient basis either for issuing subpoenas or for requiring the Government to come forward with proof rebutting the allegations. The military judge ruled, however, that since the issue of command influence had been raised, the prosecution was required to meet the issue.[53] The military judge further indicated that he would accept defense counsel's allegations as fact unless the prosecution showed otherwise.

The Government subsequently called a number of witnesses: Colonel Lathrop, the staff judge advocate; Lieutenant Colonel Vincent and Captain Hill, who formally accused Calley of the charges subsequently lodged against him; Lieutenant Colonel Garrison, who had forwarded the charges with a recommendation of general court-martial; Lieutenant Colonel Cameron, who was directed to conduct an impartial Art. 32 investigation[54] into the charges against Calley and submit his independent recommendations to the court-martial convening authority, the commanding officer of Fort Benning; and Generals Oscar Davis and Orwin Talbott, who together commanded Fort Benning (where Calley was accused, tried and convicted) from Au-

**53.** Judge Kennedy stated:

[Y]ou better be prepared when you come in here . . . to show by live witnesses whether or not there has been influence on any commanders here at Fort Benning to prefer any charges against Lieutenant Calley. I think the issue is raised squarely by the statements, if true, that the defense has previously introduced in these proceedings, the quotes from *Time* magazine and *Life* and others as to the interest of the President, the Secretary of Defense and the Secretary of the Army . . . . . When there is a specter of command influence, the government must dispel it.

Tr., 116–117.

**54.** An Article 32 investigation is a probable cause type investigation designed to eliminate unfounded charges and gather evidence should a charge be brought to trial. See *Humphrey v. Smith,* 336 U.S. 695, 698, 69 S.Ct. 830, 93 L.Ed. 986 (1949). It has been labeled the discovery proceeding of military jurisprudence. *Juhl v. United States,* 1967, 181 Ct.Cl. 210, 383 F.2d 1009, 1016, rev'd on other grounds *sub nom., United States v. Augenblick,* 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). Though somewhat analogous to a grand jury proceeding, potential defendants have a right to know the charges against them, to cross-examine witnesses against them, and to present evidence in their own behalf during the investigation. The accused is also entitled to a copy of the charges against him if they are forwarded by the investigating officer, as well as a copy of the substance of the testimony taken on both sides. Article 32, 10 U.S.C. § 832, provides in part:

(a) No charge or specification may be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made. This investigation shall include inquiry *as to the truth of the matter set forth* in the charges, consideration of the form of charges, and a recommendation as to the disposition which should be made of the case in the interest of justice and discipline.

(b) The accused shall be advised of the charges against him and of his right to be represented at that investigation by counsel. Upon his own request he shall be represented by civilian counsel if provided by him, or military counsel of his own selection if such counsel is reasonably available, or by counsel detailed by the officer exercising general court-martial jurisdiction over the command. At that investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available and to present anything he may desire in his own behalf, either in defense or mitigation, and the investigating officer shall examine available witnesses requested by the accused. If the charges are forwarded after the investigation, they shall be accompanied by a statement of the substance of the testimony taken on both sides and a copy thereof shall be given to the accused.

gust 1969 until the completion of Calley's trial. The testimony of these individuals is discussed fairly and at length in the opinion of the Court of Military Review. 46 C.M.R. at 1151–1157. In substance, each person testified that his aspect of the charging process was unimpeded and uninfluenced by "higher-ups." Captain Hill testified that some of the younger Army attorneys in his legal office feared that Presidential or command interest, together with the political repercussions of bringing charges against Calley, would lead to a cover-up. But the young officers vowed that at least one of them would prefer charges against Calley regardless of any such pressure or cover-up attempt. Captain Hill himself later accused Calley and preferred a charge against him. Lieutenant Colonel Cameron was brought in to establish that his investigation of the charges was unbiased and uninfluenced. The defense interrupted the testimony of Lieutenant Colonel Cameron, and conceded and stipulated on the record that Cameron's investigation was impartial and not improperly influenced. General Talbott, who was the final arbiter of the decision to convene the court-martial and try Calley, testified that he referred the charges to trial "solely on my judgment, on the principles of law, and the Article 32 investigation." The defense called Colonel Kiersey to substantiate their allegations of superior influence, but the record shows that even Kiersey's actions were unaffected by command pressure.

In sum, the military courts' findings conclusively demonstrate that there was no colorable showing that any of the officers involved in processing charges against Calley were influenced either directly or indirectly by command pressure in their disposition of the case.[55] At the conclusion of the testimony on this issue, Judge Kennedy stated, "[A]t this point there is absolutely no evidence that these people [Secretary Laird, Secretary Resor, General Westmoreland] communicated with any of the commanders down here." The Court of Military Review exhaustively reviewed this question, and concluded:

All of the officers required to make a decision or recommendation in the processing of the charges against Lieutenant Calley testified that they did not receive, directly or indirectly, any instructions as to the appropriate disposition of the case.

46 C.M.R. at 1154.

The rule governing the issuance of subpoenas under military law, paragraph 115a of the Manual for Courts-Martial (Rev. ed. 1969),[56] makes materiality and relevance important factors in the discretionary decision to issue a subpoena, and is very similar to Fed.R.Crim.P. 17(b). Rule 17(b) vests broad discretion in the district judge to grant subpoenas on behalf of indigent defendants where it is claimed that "the presence of the witness is necessary to an adequate defense."[57] But we have consistently held

---

55. Cf. *Hoskins v. Wainwright*, 5 Cir., 1971, 440 F.2d 69, 71, where we said in a habeas case that the right to compulsory process is not absolute, and that a state could properly require a defendant requesting process to display some colorable need for the person to be subpoenaed.

56. Paragraph 115a provides as follows:
A request for the personal appearance of a witness will be submitted in writing, together with a statement, signed by the counsel requesting the witness, containing (1) a synopsis of the testimony that it is expected the witness will give, (2) full reasons which necessitate the personal appearance of the witness, and (3) any other matter showing that the expected testimony is necessary to

the ends of justice. The decision on the request must be made on an individual basis in each case by weighing the materiality of the testimony and its relevance to the guilt or innocence of the accused, together with the relative responsibilities of the parties concerned, against the equities of the situation.

57. Fed.R.Crim.P. 17(b) provides as follows:
The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. If the court orders the subpoena to

that the discretion vested in the trial court is circumscribed by the requirements of the Sixth Amendment. We have also adhered to the rule that

> "if the accused avers facts which, if true, would be relevant to any issue in the case, the requests for subpoenas must be granted, unless the averments are inherently incredible on their face, or *unless the Government shows, either by introducing evidence or from matters already of record, that the averments are untrue* or that the request is otherwise frivolous." . . . That test places the burden of showing frivolity or abuse of process on the Government, where it properly belongs.

*Welsh v. United States,* 5 Cir., 1968, 404 F.2d 414, 417–418, quoting *Greenwell v. United States,* 1963, 115 U.S.App.D.C. 44, 317 F.2d 108, 110 (emphasis added). For cases following the rule in *Welsh,* see, e. g., *United States v. Joyner,* 5 Cir., 1974, 494 F.2d 501, 507, *cert. denied,* 419 U.S. 995, 95 S.Ct. 308, 42 L.Ed.2d 268; *United States v. Romano,* 5 Cir., 1973, 482 F.2d 1183, 1195, *cert. denied,* 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753; *United States v. Moudy,* 5 Cir., 1972, 462 F.2d 694, 697–698; *United States v. Hathcock,* 5 Cir., 1971, 441 F.2d 197, 199–200. Cf. *United States v. Smith,* 5 Cir., 1971, 436 F.2d 787, 790, *cert. denied,* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142, where we noted that a defendant's statements in an application to subpoena a witness do not "require the court to accept what is said in the application as gospel and forbid resorting to other sources to test the veracity of the averments."

 Under our previous cases, it is clear that if the prosecution successfully shows to be untrue the allegations upon which a request for the subpoenaing of a witness is based, there is no statutory or constitutional infirmity in the refusal to subpoena such witnesses. The military judge conducted an exten-sive hearing on Calley's contentions. He found there was no evidence to support the accusations of command influence. The defense was then forced to take the position that, although no one at Fort Benning was pressured into bringing charges as a result of command influence, General Westmoreland, the Secretary of Defense and the Secretary of the Army might nonetheless state, if called as witnesses, that they had in fact wielded such pressure. We hold that the conclusions of the military judge, which were fully and fairly considered and reaffirmed by the Court of Military Review, amply support the decision not to subpoena the witnesses in question.

 In holding to the contrary, the district court exceeded the proper scope of review, and completely disregarded the finding of the military judge and the Court of Military Review that there was no factual basis for the allegations upon which the subpoena requests were premised. The district judge instead conducted his own review of the testimony presented to the military court, and concluded that there was improper influence and that the requested witnesses were necessary to Calley's defense. See 382 F.Supp. at 695 & n. 31, 696, 697 & nn. 35 and 36, 699. In our previous discussion of the scope of review, we have shown that it is erroneous for federal courts to "reweigh[ ] each item of relevant evidence in the trial record . . .." *Burns v. Wilson,* 346 U.S. at 146, 73 S.Ct. at 1051. *Burns* and its progeny require at a minimum that findings on disputed factual issues be adhered to where, as here, the issues have been "fully and fairly considered." See, e. g., *Parker v. Levy, supra,* where the Court stated that factual determinations adverse to a petitioner could not be relitigated in habeas corpus proceedings and thus were beyond the proper scope of review. 417 U.S. at 760–761, 94 S.Ct. at 2564. As we held, *supra,* where a partic-

be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed in behalf of the government.

ular claim is inextricably interwoven with or dependent on factual disputes and determinations appropriately considered by the military, federal courts may not intervene further by way of habeas corpus. It was therefore improper for the district judge to reweigh and reevaluate the factual disputes previously resolved and considered within the military courts.

■■ There is another important factor. After denying the request to subpoena Laird, Resor and Westmoreland, the military judge left open the possibility of granting the defense request. The military judge suggested that defense counsel attempt to obtain information from those persons about what their testimony might be, because defense counsel had conceded that he knew of no instance in which the individuals had been contacted personally regarding this matter. Defense counsel stipulated that he would make personal inquiries to the three individuals, and return subsequently with an offer of additional proof to justify granting the subpoenas should he develop any new information.[58] Counsel failed to offer to the court any further evidence on the subject. Accordingly,

petitioner may not now successfully claim that the military court's procedures were so grossly improper that there exists an error of constitutional magnitude. Cf. *United States v. Smith, supra*, 436 F.2d at 790.

### The Failure to Subpoena John Tunstal

■■ The district court also held that petitioner was deprived of his right to compulsory process by the military court's failure to subpoena John Tunstal to testify on Calley's behalf. The defense represented that Tunstal would testify that prior to March 16, 1968, prosecution witness Dennis Conti had been reprimanded or disciplined by petitioner for a sexual assault on a Vietnamese woman. This was claimed to support the defense contention that Conti was biased or prejudiced against Calley. But under questioning from the military judge, defense counsel acknowledged that this alleged incident occurred prior to My Lai, that Tunstal's previous statements had never indicated his knowledge of any such incident, that Tunstal had not even indicated whether Calley was present at or aware of the assault, and that Tunstal did not even indicate that

---

**58.** The following colloquies are instructive:

MJ [Military Judge]: The point was made initially, the offer of proof as to what you thought you were going to say.

IC [Defense Counsel Latimer]: That is correct.

MJ: Which of course, raises in my mind the issue of command influence, but at this point there is absolutely no evidence that these people in any way communicated with any of the commanders down here. . . . [A]bsent any showing at all that there was a communication, I don't see why a subpoena should be issued to any of these three people. I take it the Government resists the issue of a subpoena. If they consent, then . . . . .

TC [Prosecution]: It does.

MJ: Very well.

IC: I'm not even sure they'll answer the questions at all without a subpoena. They may refuse to answer them. Then what do I do? I think I should have some way of getting the information. Now, I'm perfectly willing to find out if they'll interview and if they'll take an interview, and we'll

go up and see exactly whether they do have any information that would be relevant in this case.

MJ: Why don't—this time then I'll deny the request for the subpoenas at this time absent a further showing on the part of the defense if their testimony in fact would be relevant.

Tr. 272–273.

Shortly thereafter, defense counsel succinctly stipulated for the record his understanding of the agreed-upon procedure:

IC: I see, I'm perfectly willing to stipulate with the Government that I will make inquiry of the witnesses we have been talking to and that if it's decided that we can make a presentable showing that we will furnish the information in written form to the judge, and if at that time, it is decided to go further, we would include at that time any requests for any further action, and I believe I would stipulate the arguments could be made either by brief, or they can be made by Major Raby in my absence.

Tr. 304.

the incident was reported. Thus, the import of Tunstal's testimony was only that he was aware of an assault by Conti on a Vietnamese woman prior to My Lai. That Conti had engaged in sexual misconduct was well established at trial. See 382 F.Supp. at 699 n. 40. To the extent that the testimony to be given by Tunstal would corroborate or verify the testimony of both defense and prosecution witnesses, there was no error in the failure to call Tunstal. Where the expected testimony of an individual is merely cumulative of other testimony to the same effect, there is no violation of the Sixth Amendment in the failure to subpoena such witness. *United States v. Beasley,* 5 Cir., 1973, 479 F.2d 1124, 1128, cert. denied, 414 U.S. 924, 94 S.Ct. 252, 38 L.Ed.2d 158; *United States v. Romano,* 5 Cir., 1973, 482 F.2d 1183, 1195, *cert. denied,* 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753; *United States v. Chapman,* 5 Cir., 1972, 455 F.2d 746, 748; *Thompson v. United States,* 5 Cir., 1967, 372 F.2d 826, 828. If Tunstal had been able to connect Calley with the incident in such a way as to show not only that Calley had learned of the incident but that Conti had reason to be antagonistic to Calley because of it, the evidence would have been relevant. The military judge, therefore, stated that he would reconsider the subpoena request upon a defense showing that Tunstal's testimony would somehow connect Calley with the incident. Despite this opportunity, no such connection was ever subsequently demonstrated. Hence, we find no error in the failure to subpoena Tunstal.[59]

### V. Discovery of Congressional Testimony

After the charges had been made against Calley and others, and national attention had been directed to the Army's handling of the case, Chairman L. Mendel Rivers of the House Armed Services Committee appointed an investigating subcommittee to make "a completely independent assessment of the case," to be in charge of Congressman F. Edward Hebert. During its investigation, the subcommittee interviewed 152 witnesses, held 16 days of hearings, took 1,812 pages of sworn testimony, and examined hundreds of documents. In addition, the subcommittee took 3,045 pages of statements from witnesses, and conducted its own field investigation in Vietnam. Prior to commencing formal hearings, Congressman Hebert wrote Chairman Rivers a letter outlining the subcommittee's intended areas of study, and said:

> Because of the pendency of certain criminal proceedings in the military courts and because some of the testimony expected before our Subcommittee may come within the purview of House Rule XI, we expect to hear all of our witnesses in executive session. And in a further effort to avoid prejudicing the rights of any present or potential defendant in any criminal case growing out of the alleged My Lai incident, the Subcommittee report will not seek to fix criminal responsibility. We feel that judgments in this area are within the purview of the courts.

Report of the Armed Services Investigating Subcommittee of the House Armed Services Committee, Investigation of the My Lai Incident, 91st Cong., 2d Sess. 3 (Comm.Print, July 15, 1970) [hereinafter cited as Hebert Report].

 After the publication of the subcommittee report, the defense moved to

---

**59.** The refusal to subpoena Tunstal under the facts and circumstances of this case stands in stark contrast to those cases where we have found error in a trial court's refusal to subpoena a witness for a defendant. See *United States v. Hathcock,* 5 Cir., 1971, 441 F.2d 197 (error to refuse to subpoena witness who stated he would testify that the defendant was unconnected with the offense for which he was charged); *Welsh v. United States,* 5 Cir., 1968, 404 F.2d 414 (error to refuse to subpoena doctor who would testify defendant was mentally incompetent at time he was alleged to have committed the crime for which he was charged); *Taylor v. United States,* 5 Cir., 1964, 329 F.2d 384 (error to refuse to subpoena psychiatrist for defendant who relied on insanity defense).

obtain production of "[a]ll witness testimony and documentary evidence in the custody and control of the House of Representatives of the United States." The Army prosecutor made an informal inquiry of Congressman Hebert whether the material might be furnished. Hebert replied that it was the subcommittee's position that the documents requested were neither within the purview of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) nor subject to the requirements of the Jencks Act, 18 U.S.C. § 3500. However, a list of persons who had testified before the subcommittee was provided counsel. On October 13, 1970, Judge Kennedy denied the general discovery request pertaining to all material in possession of the subcommittee. Referring to the mass of material already provided the defense, and noting that "the discovery processes are not designed to permit an accused to fish blindly for evidence with only hope for tackle and prayer for bait," the military court concluded that adequate discovery had been given the defense and that discovery of all congressional testimony, as such, was not warranted. But as to the statements before the subcommittee of prospective prosecution witnesses, the military judge requested the House of Representatives to release evidence and testimony given the subcommittee by named prosecution witnesses. The House of Representatives did not act on this request or on the renewed request made in February 1971. Neither the defense nor the prosecution had access to the material, and the material was never released to the military judge for *in camera* inspection. The district judge held that Congress acted wrongly in declining to provide the materials, notwithstanding Rule XI, paragraph 26(m), of Rules of the House of Repre-

sentatives, and Article I of the Constitution, which provides that each House of Congress need not publish in a journal of proceedings "such Parts as may in their Judgment require secrecy." The district court further held that the inability of the defense to obtain the prior testimony before the Hebert Subcommittee of those witnesses who also testified for the prosecution at trial denied Calley due process. The district court concluded that the inability to obtain this privileged congressional testimony violated the Jencks Act. We disagree, and conclude that there was no denial of due process in the failure to supply the prior testimony, and that even if a Jencks Act violation occurred, it does not rise to a level warranting habeas corpus relief.[60]

### Due Process

■ The nature and extent of discovery allowed a defendant in a criminal case is relevant to the issue of whether due process requirements have gone unmet by the inability of the defense to obtain certain requested material. See *United States v. Ross,* 5 Cir., 1975, 511 F.2d 757, 763. Those tried before courts-martial have a substantial procedural advantage over civilian defendants in that Article 46 of the U.C.M.J., 10 U.S.C. § 846, provides that the prosecution and the defense "shall have equal opportunity to obtain witnesses and other evidence . . . ." See Moyer, Procedural Rights of the Military Accused: Advantages over a Civilian Defendant, 22 Maine L.Rev. 105 (1970). Thus, prior to the trial of this case, the defense enjoyed extensive discovery. Pursuant to the "equal discovery" requirement of military law, the defense obtained all testimony and statements gathered by Army investigators inquiring into the case un-

---

**60.** We do not consider whether the Hebert Subcommittee could properly invoke its congressional privilege and correctly refuse to furnish the requested testimony. The issue before us is not the legality of this action, but rather the effect of denying the testimony to the defense. Even if the privilege were properly invoked and the testimony validly with-

held, the withholding of the material might require the Government to let the petitioner go free if he was denied evidence essential to his defense. Cf. *United States v. Reynolds,* 345 U.S. 1, 12, 73 S.Ct. 528, 534, 97 L.Ed. 727 (1953); *Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957).

der the direction of the Army Inspector General. All statements and testimony obtained by the Army's Criminal Investigation Division were provided to the defense. Additionally, all criminal investigation progress notes gathered by the Army were furnished the defense to enable it to contact any witness, including those from whom statements were not taken, interviewed by the criminal investigators. The defense was given full access to the Peers Report, although it was classified and not released to the public. The Peers Report was credited in the Hebert Subcommittee Report with being "a very thorough examination of the events of March 16, 1968, and those immediately preceding and subsequent thereto." Hebert Report at 43. In addition to access to the Peers Report itself, the defense received the extensive testimony, reports and material presented to General Peers' inquiry panel. The Peers material included some 20,000 pages of testimony from almost 400 witnesses, and, in addition, contained 240 photographs, 119 Army directives and over 100 miscellaneous documents. Moreover, the defense was furnished with blanket travel orders to enable investigation and interrogation of potential witnesses at Government expense. Under this arrangement, defense counsel was able to spend a period of time in Vietnam and conduct an independent investigation at Government expense. Beyond this, the defense had copies of the testimony presented to the Article 32 investigating officer, as well as that officer's report and recommendation to the court-martial's convening officer. The discovery by the defense was so extensive that, of the 13 witnesses appearing before both the Hebert Subcommittee and the court-martial, the defense already possessed at least two prior statements, and often more, from all 13 witnesses save one, for whom they possessed one prior statement.[61] Under the circumstances, we find it impossible to conclude that there was any due process fundamental fairness infirmity in the discovery process.

In the leading case of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–1197. *Brady* requires the disclosure of material evidence favorable in the sense of mitigation or exculpation, and also requires the prosecution to disclose evidence important and useful for impeachment purposes. See *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Thus the principles of *Brady* do not apply unless the evidence is material to mitigation, exculpation or impeachment. *United States v. Hildebrand,* 5 Cir., 1974, 506 F.2d 406, 409.

The materiality requirement of *Brady* and subsequent cases is important here, for not every piece of evidence potentially useful to the defense need be disclosed. In *Ross v. Texas,* 5 Cir., 1973, 474 F.2d 1150, cert. denied, 414 U.S. 850, 94 S.Ct. 141, 38 L.Ed.2d 98, we rejected the suggestion that *Brady* encompasses all material which might have led a jury to entertain a reasonable doubt as to a defendant's guilt. We have instead held that before the nondisclosure of evidence reaches a level of constitutional significance, the evidence must be "crucial, critical, highly significant . . . ." *Luna v. Beto,* 5 Cir., 1968, 395 F.2d 35, 41 (en banc) (Brown, C. J., concurring, joined by a majority of the court). See

---

**61.** While the defense lists 13 witnesses as testifying before the Hebert Subcommittee and at the court-martial on behalf of the prosecution, the Court of Military Review found that only 11 persons had done so. 46 C.M.R. at 1185. We accept the defense figure, but point out that there appears to be little overlap between the prosecution case and the Hebert investigation in that the testimony of only 13 witnesses out of a total of 152 Hebert Subcommittee witnesses is at issue.

also *Ross v. Texas, supra,* declining to grant a writ of habeas corpus unless the evidence was "vital, critical and significant[ly important] in determining the truth of the charges and would have a serious bearing on the fundamental fairness of the trial." 474 F.2d at 1154. "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. . . . There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States v. Ross,* 5 Cir., 1975, 511 F.2d 757, 762–763. See *Shuler v. Wainwright,* 5 Cir., 1974, 491 F.2d 1213, 1220–1224; *United States v. Miller,* 10 Cir., 1974, 499 F.2d 736, 744; *Warren v. Davis,* 5 Cir., 1969, 412 F.2d 746, 747.

█ While the testimony in question was assertedly needed for adequate cross-examination, this was not an instance where the "estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence . . . ." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); see *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In *Napue* and *Giglio,* convictions were reversed for the failure to provide the defense with certain information critical to the credibility of a key prosecution witness. More generally, when *Brady* is invoked to obtain information not favorable on the issue of guilt or innocence but useful for attacking the credibility of a prosecution witness, the information withheld must have a definite impact on the credibility of an important prosecution witness in order for the nondisclosure to require reversal. See, e. g., *United States v. Tashman,* 5 Cir., 1973, 478 F.2d 129 (nondisclosure of plea bargaining session pertaining to defendant-turned-witness whose testimony was critically important); *Flanagan v. Henderson,* 5 Cir., 1974, 496 F.2d 1274 (withholding of rape prosecutrix's original affidavit charging another person with crime); *United States v. Deutsch,* 5 Cir., 1973, 475 F.2d 55 (failure to turn over to defense personnel file of witness who "was the government's whole case"); *United States v. Hibler,* 9 Cir., 1972, 463 F.2d 455 (nondisclosure of evidence refuting uncorroborated testimony of key accomplice-witness); *Powell v. Wiman,* 5 Cir., 1961, 287 F.2d 275 (nondisclosure of psychological background of key witness); cf. *Evans v. Janing,* 8 Cir., 1973, 489 F.2d 470 (reversal not required where no significant chance undisclosed evidence would have induced reasonable doubt in jurors' minds).

The defense has not made the necessary showing of materiality in this case. The defense apparently concedes that there is not even a reasonable possibility that any of the evidence would be exculpatory, since it argues only that the requested testimony was essential for impeachment purposes. It is contended that it "was impossible for the defense to question" the witnesses' truth or veracity without access to the prior testimony. This assertion overlooks or ignores the fact that the defense had numerous statements available for the cross-examination of every witness in question. This fact forces the defense to make the extremely speculative assertion that the "statements made to the Subcommittee cannot be equated to other statements [possessed by the defense]" because "there is a greater chance a witness would tell the 'truth' at a Congressional hearing . . . ." We find this argument unpersuasive. Moreover, a number of the witnesses in question did not provide testimony essential to the prosecution's case. The Court of Military Review noted that "[t]hose witnesses who testified before the investigating subcommittee and at trial did not present the heart of the Government's case." 46 C.M.R. at 1195. For example, witnesses Colburn, Hodde, Lagunoy and Culverhouse testified regarding the killings that occurred in My Lai. Calley's position at trial was not to refute the assertion that the killings occurred and that he participated in them, but rather

to establish that what happened was the result of following orders of a superior officer. Thus, there is no basis given this Court upon which to conclude that the unavailable evidence was of a "crucial, critical, highly significant" nature. *Luna v. Beto, supra.* Since the defense possessed essentially all the information known to the prosecution, it is not unreasonable to require some showing or justification for the assertion that the inability to obtain the pretrial testimony in question deprived Calley of a fair trial. Given the vast amount of pretrial discovery afforded the petitioner, the fact that the defense possessed prior statements by all witnesses who testified both before the Hebert Subcommittee and the court-martial, the noncritical nature of many of the witnesses' testimony, and the inability of the defense to offer even a reasonable possibility that something helpful to the defense was adduced before the Hebert Subcommittee that was not developed in the thousands of pages of testimony, statements and documents already afforded the defense, we find no constitutional defect in the failure to obtain this testimony.

An additional factor is relevant to our conclusion that there was no *Brady* due process problem in this case. The testimony in question was never available to the prosecution, which not only did not benefit from the information, but was not responsible for its nonproduction. This fact distinguishes the present case

from other *Brady* cases, because the defense contention in the present case is that *Brady* or the Due Process Clause entitles the defense to obtain evidence unavailable to the prosecution and beyond the power of the prosecution to obtain.

The holding of the *Brady* case, quoted *supra,* is that "the suppression *by the prosecution*" of certain kinds of evidence violates due process. The basic import of *Brady* is not that there is an abstract right on the part of the defendant to obtain all evidence possibly helpful to his case, but rather that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness. As we stated most recently in *United States v. Ramirez,* 5 Cir., 1975, 513 F.2d 72, 78, *Brady* "rests upon an abhorrence of the concealment of material arguing for innocence by one arguing for guilt." 513 F.2d at 78. The Supreme Court's most recent discussion of *Brady* is in *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). There, the Court stated that "[t]he heart of the holding in *Brady* is the *prosecution's suppression* of evidence, in the face of a defense production request . . . ." (Emphasis added.) The Court then noted that prosecutorial suppression of evidence is one of the three elements of a *Brady* violation. 408 U.S. at 794–795, 92 S.Ct. at 2568.[62]

---

**62.** We recently held that suppression is an important element of the due process issue. In *Flanagan v. Henderson,* 5 Cir., 1974, 496 F.2d 1274, 1276, we stated that due process is denied when the prosecution "deliberately" keeps from the defendant "evidence *in its possession* which was favorable to [the defendant's] acquittal . . . ." (Emphasis added.) See *Shuler v. Wainwright,* 5 Cir., 1974, 491 F.2d 1213, 1220–1224; *United States v. Ruggiero,* 2 Cir., 1973, 472 F.2d 599, 604, cert. denied, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398; *Giles v. Maryland,* 386 U.S. 66, 96, 87 S.Ct. 793, 808, 17 L.Ed.2d 737 (1967) (White, J., concurring).

The situation most closely resembling the *Brady* issue presented in this case occurred in *United States v. Ehrlichman,* D.D.C., 1974, 389 F.Supp. 95. There, G. Gordon Liddy moved to strike the testimony against him of E. Howard

Hunt "on the ground that prior testimony of Hunt given under oath in executive session before the Subcommittee on Intelligence of the House Armed Services Committee last year has not been produced . . . ." Both the Jencks Act and *Brady v. Maryland* were invoked to establish that the nonproduction of testimony was improper. In his opinion rendered July 3, 1974, Judge Gesell of the District of Columbia District Court concluded that *Brady* was inapplicable to the request because "[t]he subpoenaed testimony is not in the possession of the Government within the meaning of that decision, since the Subcommittee is neither an investigative or a prosecutorial arm of the Executive branch nor an agency of the Government in any way involved in the offense or related transactions." (citations omitted).

There is no prosecutorial dereliction in this case. The Army trial counsel was actively involved in communication and correspondence with Congress in an attempt to obtain the requested material. Compare *United States v. Deutsch, supra.* But the information in question was denied to both parties. The essential purpose of the *Brady* rule and broadened criminal discovery is to equalize access to available evidence and give both the defense and the prosecution the maximum information practicable with which to prepare cases. Cf. *Williams v. Florida,* 399 U.S. 78, 82, 90 S.Ct. 1893, 1896, 26 L.Ed.2d 446 (1970). The fact that *Brady* establishes a limited "equal access" requirement and not a broad discovery rule is indicated in *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973). There, the Supreme Court noted that "[a]lthough the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded, but cf. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it does speak to the balance of forces between the accused and his accuser." *Id.* at 474, 93 S.Ct. at 2212. The leading articles on enhanced criminal discovery [63] emphasize what we stress here, that *Brady* and other means of criminal discovery indicate the need for disclosure of important information known or available to the prosecutor in order to promote the fair administration of justice. This assures the defense and the public that prosecutors will not pursue convictions at the expense of justice. As the Supreme Court has stated, "In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact." *Dennis v. United States,* 384 U.S. 855, 873, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973 (1966). The prosecution clearly did not have "exclusive access" to the testimony in question—it had no access at all. To this date, there has been no holding that *Brady* confers on the defense a right to receive information or evidence greater than that possessed by the prosecution, and we decline to so hold now.

### Jencks Act

The defense also invoked the Jencks Act, 18 U.S.C. § 3500, in its attempt to obtain the congressional testimony of prosecution witnesses. The Jencks Act provides that after a witness "called by the United States" has given testimony, the "United States" must produce to the defense any prior statement of the witness "in the possession of the United States" relevant to the subject matter of the witness' testimony. 18 U.S.C. § 3500(b). If such statements are not provided, the trial court may strike the testimony or, if necessary, declare a mistrial. 18 U.S.C. § 3500(d). Both sides agree that the Jencks Act applies to military proceedings. The question here is the application of the Act where certain statements of prosecution witnesses are possessed by Congress but withheld from both the prosecution and the defense. If the "United States" [the prosecution] calls a witness, are statements retained by the Congress "in the possession of the United States" so as to require furnishing the defense with the statements even though the prosecution does not possess and cannot obtain the statements? Stated otherwise, are statements within the sole possession and control of the legislative branch "in the possession of the United States" within the meaning of the Jencks Act?

The district court held that under the Jencks Act "the statement need not be made to or held by the prosecution; any statement held by any part of the United States Government is covered." 382 F.Supp. at 700. The Court of Military

---

**63.** See Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth? 1963 Wash.U.L.Q. 279; Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L.J. 1149 (1960); Traynor, Ground Lost and Found in Criminal Discovery, 39 N.Y.U.L.Rev. 228 (1964).

Review concluded that since the term United States was used in the Act many times "in a functional, prosecutorial sense," to give the Act's language internal consistency the term "United States" should be interpreted as applying to the executive branch. Thus, it concluded the Act "touches statements collected by or given to those persons who play some role in the execution and enforcement of the laws." See 46 C.M.R. 1190–1194.[64] We need not decide, however, whether Congress intended by enacting the Jencks Act to subject its own files and records to the Act's disclosure requirements.[65] The narrower issue is whether the failure to furnish the testimony created a defect of constitutional magnitude in the court-martial proceeding.

The Jencks Act followed swiftly on the heels of the Supreme Court decision in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), which reversed a federal conviction because of the failure to provide the defense with certain pretrial statements of key Government witnesses. But the Supreme Court has noted that the *Jencks* decision was "not required by the Constitution," *Scales v. United States,* 367 U.S. 203, 258, 81 S.Ct. 1469, 1501, 6 L.Ed.2d 782 (1961), and that the decision was not cast in constitutional terms. *Palermo v. United States,* 360 U.S. 343, 345, 79 S.Ct. 1217, 1229, 3 L.Ed.2d 1287 (1959). The decision in *Jencks v. United States* and the Jencks Act itself do not set forth constitutional requirements. Rather "[t]hey state *rules of evidence* governing trials before federal tribunals; and we have never extended their principles to state criminal trials." *United States v. Augenblick,* 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969) (emphasis added).[66]

The Supreme Court decision in *United States v. Augenblick* controls our decision in this case, as it demonstrates

---

**64.** The only other decision on this issue occurred in *United States v. Ehrlichman* under the circumstances described in note 62, *supra.* In that case, Judge Gesell held that the Jencks Act does not apply to statements before congressional subcommittees held in executive session. The judge concluded that "[w]hile the [Jencks] Act probably contemplates disclosure by all Executive investigatory agencies, (*citation omitted*), there is no indication that Congress intended it to encompass its own legislative proceedings held in executive session, and its previous and continued resistance to subpoenas *duces tecum* argues strongly to the contrary. See authorities cited in *Nixon v. Sirica,* 159 U.S.App.D.C. 58, 487 F.2d 700, 715 n. 70, 738–40, 772–73 (1973)." But see Note, A Defendant's Right to Inspect Pretrial Congressional Testimony of Government Witnesses, 80 Yale L.J. 1388 (1971), concluding that defendants should have a right to inspect such statements or to prevent from testifying prosecution witnesses whose congressional testimony is not provided.

**65.** Petitioner cites *Harney v. United States,* 1 Cir., 1962, 306 F.2d 523, cert. denied, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171; *United States v. Lev,* 2 Cir., 1958, 258 F.2d 9, aff'd by equally divided court, 360 U.S. 470, 79 S.Ct. 1431, 3 L.Ed.2d 1531 (1959), and *United States v. Tane,* E.D.N.Y., 1962, 29 F.R.D. 131, for the

proposition that the Jencks Act can require the production of testimony held by a congressional committee. In each case, however, the request for testimony was deemed inappropriate, or the material sought was not found to be a statement within the meaning of the Act, and the Act's application to Congress was not directly considered. Thus, none of the cases are authority for the contention that Jencks Act statements within the possession of Congress must be produced at trial under the Jencks Act after the prosecution calls a witness who gave such statement to a committee of Congress.

**66.** An analogous question was presented to the Supreme Court in *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 150 (1953), where the petitioners contended that their confessions should not have been admitted at trial. They argued that the rule of *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) rendered the confessions inadmissible because they had been obtained without promptly being arraigned or taken before the committing authority. The Supreme Court held that the *McNabb* rule was not a due process requirement but "a rule of evidence in the federal civil courts," and rejected the petitioners' contention as not being of constitutional dimension. 346 U.S. at 145 n. 12, 73 S.Ct. at 1050 n. 12.

that no error of constitutional proportions is raised by the failure to provide the defense with the prior testimony of the witnesses in question. In that case, Augenblick had been accused of performing an act of oral sodomy with one Hodges, and was convicted by court-martial of committing an indecent act. Hodges was interviewed by armed forces police soon after the arrest, and the interview was taperecorded. Hodges apparently denied at first that anything had happened, but later testified against Augenblick and in fact was given an honorable discharge after Augenblick was convicted. The defense demanded that the tape recording of Hodges' interview be furnished under the Jencks Act. However, the tapes had been destroyed, and were therefore not furnished. The Court of Claims held that this violation of the Jencks Act required a conclusion that the conviction was improper, because Hodges was "the all-important prosecution witness. Without his testimony it seems unlikely that the court-martial would have convicted, even of the lesser offense." 377 F.2d 586, at 605. The Supreme Court reversed and held that the Court of Claims erred, because "in a conscientious effort to undo an unjustice, [it] elevated to a constitutional level what it deemed to be an infraction of the Jencks Act . . . ." 393 U.S. at 356, 89 S.Ct. at 533–534. Thus under the authority of *Augenblick*, there was no constitutional error in the failure to provide the testimony of the witnesses here.

### VI. Notice and Double Jeopardy

The district court also held that the Charges, Specifications and Bill of Particulars under which Calley was tried did not adequately notify him of the charges against him nor fully protect him against the possibility of double jeopardy. The court apparently found fair notice problems in the fact that the first and second Specifications of the Original Charge against Calley (the killings at the trial in the southern part of the hamlet and at the ditch in the eastern portion) covered multiple unnamed victims in a single specification. The double jeopardy problem discerned by the court was two-fold. First, quoting a hypothetical situation posed by Calley's counsel, the district court found that there was a risk that Calley might have been twice convicted for killing the same individual within the same trial. See 382 F.Supp. at 710. Second, the district court speculated that Calley might again be charged for other killings in Vietnam and might not be able accurately to plead former conviction.[67] We find no merit in these conclusions.

Fair notice and double jeopardy issues involve requirements of both the Fifth and Sixth Amendments. See *United States v. Sanchez*, 5 Cir., 1975, 508 F.2d 388, 395. The Constitution requires that criminal charges be sufficiently specific (1) to apprise the defendant of what he must be prepared to meet at trial, and (2) to enable the defendant to show with accuracy the extent to which he may plead former acquittal or conviction in other proceedings brought against him for a similar offense. *Russell v. United States*, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962) and cases cited. We are satisfied that the charges against Calley, as amplified in

---

67. The district judge held:

Since the news media told the world that this "murdering monster" could have been involved in the killing of as many as 600 "innocent civilians", and considering the predilection of some to make Calley responsible for everything that happened in Vietnam, it is not inconceivable that further charges may be brought against him in some tribunal accusing him of the murder of "578 individuals of no specific age or sex" (or the

"victim" *might even be specified*); how would it then be known by the accused whether he had already been convicted for the murder of 22 of them, since the "persons" alleged to be the victims of the murders for which he *has been* convicted are not identified in the specification or bill of particulars?

382 F.Supp. at 710–11 (emphasis in original).

the Bill of Particulars, met these requirements.

 The charges set forth the time and place of the alleged offense. Under the Bill of Particulars, the prosecution set forth the chronological sequence of the separate charges: the killings at the trail occurred first, followed by the killings at the ditch, and next followed by the murder of the monk and then the child. The Bill of Particulars specified the actual physical location: the killings at the trail were in the southern portion of the village, those at the ditch occurred in the eastern part of My Lai (4). The instructions of the military judge were detailed and thorough, and required the prosecution's proof to conform to these allegations in the Bill of Particulars. The killings of the monk and the child, for example, were required to be proven as occurring in sequence after the mass killings at the ditch. The effect of Judge Kennedy's instructions is most evident with regard to the alleged killings at the trail. While there was substantial evidence of extensive participation by Calley in the slaying of the estimated 30–40 persons at this location, the court members returned a verdict of guilty for "not less than one" murder. This was no doubt due to the instructions and the testimony of a pathologist that he could point to only one wound on one body which he was certain to have been instantly fatal. Also, in considering the fair notice requirement, we mention again that Calley did not deny his involvement and participation in the mass killings at the ditch and the trail. It is difficult to understand how a defendant is deprived of fair notice of the charges against him when he confirms that the alleged incidents happened and that he participated in them. We are convinced that there was no failure to provide Calley fair notice of the charges against him, nor is there any likelihood that there will be any double jeopardy problems.

## VII. Petitioner Calley's Cross-Appeal

 Calley urged several additional contentions before the district court which the district judge did not discuss in his opinion. Among these was Calley's contention that the Army lacked jurisdiction over his person because he was improperly retained on active duty by the Army beyond his scheduled separation date of September 6, 1969, and that the military has no authority to court-martial a serviceman after the date of his scheduled separation by so retaining him on active duty. We agree, however, with the Government that Calley was lawfully retained in active duty status, and that military jurisdiction having properly attached prior to September 6, 1969, it continued until disposition of the case. See 46 C.M.R. at 1138–1142. We have carefully considered Calley's other contentions and, in light of our discussion of the proper scope of review in part II, *supra*, conclude that the additional issues presented for review are beyond the scope of review of the federal courts.[68]

## VIII. Conclusion

This Court is convinced that Lieutenant Calley received a fair trial from the

---

**68.** The other issues presented in the cross-appeal are as follows: (1) whether Calley was denied due process of law because he received inadequate training and preparation on when to disobey an order; (2) whether the members of the Army Court of Military Review panel which reviewed Calley's case should have disqualified themselves; (3) whether command influence prevented Calley from obtaining a fair trial; (4) whether the court-martial was without jurisdiction to try Calley because Army Chief of Staff General Westmoreland had an alleged personal interest in the proceeding, see note 50, *supra*; (5) whether the application of the "ordinary sense and understanding" standard to the defense of superior orders deprived Calley of due process or subjected him to cruel and unusual punishment; (6) whether Calley was denied due process by being prosecuted for the crime of murder under the U.C.M.J. rather than for a war crime; and (7) whether Calley's sentence by the court members was unconstitutional under the Eighth Amendment.

military court-martial which convicted him for the premeditated murder of numerous Vietnamese civilians at My Lai. The military courts have fully and fairly considered all of the defenses made by him and have affirmed that he is guilty. We are satisfied after a careful and painstaking review of this case that no violation of Calley's constitutional or fundamental rights has occurred, and that the findings of guilty were returned by impartial members based on the evidence presented at a fairly conducted trial.

There is no valid reason then for the federal courts to interfere with the military judgment, for Calley has been afforded every right under our American system of criminal justice to which he is entitled.

Accordingly, the order of the district court granting a writ of habeas corpus to Calley is

Reversed.

BELL, Circuit Judge, with whom GEWIN, THORNBERRY, MORGAN and CLARK, Circuit Judges, join (dissenting).

Justice Holmes once observed that:

"Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend."[1]

This is such a case. It was tried in the midst of the unusual emotion of the Nation's Vietnam Era. It was an emotion generated by a people sharply divided over the unprecedented and extraordinary use of our military resources in diplomacy; an emotion fueled by the print and electronic media in shaping public opinion without the impediment of censorship in what for all intent, purpose, and result was a war. The issues presented in this case, with the exception of the contention respecting the charges and their specificity, are all permeated to some extent with this atmosphere. In the view we take of the case, the withholding of evidence by the Congress (a Committee of the House), requires a new trial, or further proceedings in the district court.

Thus we would pretermit decision as to the prejudicial pretrial publicity issue. The Vietnam tragedy having ended, and the emotion and even the newsworthiness of the event and its component parts having subsided, it is unlikely that an arguable case could be made of prejudicial pretrial publicity in the event of a retrial.

Before joining issue with the majority on the conduct of Congress in withholding evidence, we note that the issue is not guilt or innocence, but whether Lt. Calley was denied substantial constitutional rights in his trial. It is necessary also to point out the following areas of agreement with the majority.

First, we agree that the scope of review in a federal habeas proceeding involving a military conviction is limited to claims:

". . . that the court-martial acted without jurisdiction, or that substantial constitutional rights have been violated, or that exceptional circumstances have been presented which are so fundamentally defective as to result in a miscarriage of justice. Consideration by the military of such issues will not preclude judicial review for the military .must accord to its personnel

1. *Northern Securities Co. v. United States,* 1904, 193 U.S. 197, 400–01, 24 S.Ct. 436, 468, 48 L.Ed. 689, 726.

the protections of basic constitutional rights essential to a fair trial and the guarantee of due process of law. The scope of review for violations of constitutional rights, however, is more narrow than in civil cases. Thus federal courts should differentiate between questions of fact and law and review only questions of law which present substantial constitutional issues. Accordingly, they may not retry the facts or reevaluate the evidence, their function in this regard being limited to determinining whether the military has fully and fairly considered contested factual issues. . . . "
Majority op., p. 203.

We believe that the withholding of evidence from Calley by the Congress is an error of constitutional magnitude within this stated scope of review.

Second, because counsel failed to preserve error in connection with the effort to subpoena Secretary Laird, Secretary Resor and General Westmoreland, we find no error of constitutional magnitude. We do not reach the question whether the military judge erred in conditioning the issuance of the subpoenas on a preliminary interview with the witnesses to determine facts within their knowledge regarding command influence. It was arguably these witnesses who would have exercised or known of the exercise of command influence. It is appropriate to note, however, that we do not approve of the idea of substituting an interview for an examination under oath as a method of proving command influence.

We also find no error in the failure to subpoena John Tunstal.

Third, we find no error warranting federal habeas relief in the notice and double jeopardy claims arising out of the Charges, Specifications and Bill of Particulars.

Fourth, we conclude that the Jencks Act violation, 18 USCA, § 3500, does not rise to the level of a constitutional claim cognizable in a federal habeas proceed-

ing involving a military conviction. Just as the majority points out, the Jencks Act does not set out constitutional requirements. *United States v. Augenblick,* 1969, 393 U.S. 348, 356, 89 S.Ct. 528, 21 L.Ed.2d 537, 545.

Fifth, we find no cognizable error or errors in Lt. Calley's cross-appeal.

This brings us to the issue, the resolution of which, in our judgement, requires a new trial or further proceedings in the district court. This issue involves the conduct of a Committee of the Congress, conduct which in the hindsight of *United States v. Nixon,*[2] if not theretofore, appears cavalier if not arbitrary. Whichever, it constituted a denial to Lt. Calley of due process by the Congress, and thereby the government. Indeed, it should be said that one can scarcely imagine a more government-oriented and government-involved set of facts.

Lt. Calley was in the army at the behest of his government; he was sent to Vietnam by his government; he was sent into combat at My Lai by his government. He was at My Lai with the consent and implied approval of the Congress. The government court-martialed him through the army and withheld evidence from him through the Congress. It is said that this is not a denial of due process. We disagree.

Our understanding of the majority opinion is that it excuses the conduct of Congress in ignoring the request of the defense, the military judge, and the prosecution, for the testimony given to a subcommittee of the House Armed Services Committee of prosecution witnesses concerning the My Lai incidents. These witnesses later testified in the Calley trial. Their testimony to the Congress was never made available to the Calley defense. No claim of privilege was asserted by Congress nor was the testimony made available to the military judge for *in camera* examination. The requests to the Congress simply went unanswered. Even subpoenas were ignored. To this date neither this court nor the district

2. 1974, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039.

court has seen the testimony, although it appears conceded that the testimony does exist.[3]

Five reasons are offered in the majority opinion to justify this course of conduct. First, more extensive pre-trial discovery rights were accorded Lt. Calley by the military court than would have been available to him in a civilian court. Second, Lt. Calley was furnished other statements of every one of the witnesses used against him whose Congressional testimony was withheld. Third, "many" of the witnesses involved gave testimony at his trial which was not critical to his conviction. Fourth, the defense was unable to meet its burden of demonstrating that the testimony withheld was material, i. e., valid impeachment material not duplicative of that already possessed by the defense. Fifth, the subcommittee's statements were not available to the military court prosecution team.

The first, second and third reasons are supportive of due process. Each one helped to assure that the trial proceedings were fair, but they cannot be viewed as complete guarantees of due process either separately or cumulatively. For example, the third reason does not claim *every* witness, whose testimony was withheld, gave noncritical testimony. We do not understand this to be an assertion that the withholding of the statements of these witnesses was, if error, harmless beyond a reasonable doubt. Moreover, the concept of due process is not satisfied with a trial that is "mostly" fair or one in which "many" aspects of fairness are present.

The fourth and fifth reasons are unusual to say the least. It is said that the defense did not demonstrate that the content of the testimony withheld by the Congress was material to the verdict.

With equal certainty, we can state that the prosecution could not show that testimony withheld was immaterial or cumulative.

When the majority fixes the "burden of proof" on Calley, it decides the issue against him. This case is distinct from every precedent that places the burden of demonstrating materiality on a defendant. These cases all involve fact situations in which the content of the material withheld was known when relief was sought. Here it was not. *Cf. United States v. Deutsch,* 5 Cir., 1973, 475 F.2d 55. The effect of the holding that Calley had this burden is to say he cannot know what Congress withheld because he does not know what they withheld.

While *Brady v. Maryland, supra,* establishes that unequal access to exculpatory facts by the prosecution over the defense can violate due process, it does not establish the opposite syllogism—if neither side has access to exculpatory facts, there can never be a violation of due process. The Constitutional guarantee of a fundamentally fair trial neither began with *Brady,* nor ended there. It is the broad Constitutional precept of fundamental fairness which separates us from the majority.

The majority concedes that under *Brady v. Maryland, supra,* earlier statements of witnesses who testify for the prosecution, would be available to the defense if material to mitigation, exculpation, or impeachment. *See Giglio v. United States,* 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.

It is argued, however, that *Brady* and its progeny speak in terms of the "prosecution" withholding evidence and thus would not apply to the Congress, citing *Moore v. Illinois,* 1972, 408 U.S. 786, 92

---

**3.** The Chairman of the Subcommittee, in response to an earlier request by the prosecution for all testimony and evidence adduced before the Congress in its My Lai investigation, took the position that *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, did not apply in the circumstances nor did the Jencks Act.

We note, as an aside, that Congress is not the body that *Brady* contemplated as making the decision of the defense's right to favorable testimony. This determination is to be made by the trial court. *See United States v. Nixon, supra.*

S.Ct. 2562, 33 L.Ed.2d 706. If this is the law, then it would follow that the denial of evidence known to exist, material to a defense, but beyond the subpoena power because of the power of some part of the government, be it executive or congressional, cannot serve as a basis for a denial of due process. The fundamental nature of due process requires that we hold otherwise.

The United States Government has brought this defendant to trial, just as surely as that same government placed him in the chain of events leading to My Lai. To state that the defendant must face the government in fragmented form, executive, congressional or judicial, is to unduly freight the right to due process. Such fragmentation effectively eases the government's burden of proof by allowing a so-called independent branch to withhold evidence material to innocence.

Over the years courts have recognized that the law "will not allow governmental privileges to work against a criminal defendant who has a substantial stake in the outcome of the trial."[4] See United States v. Reynolds, 1953, 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727, 735; Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. Even more so, a blanket refusal by the government to supply evidence favorable to a defendant results in a denial of due process of law. Though the Supreme Court in Brady spoke of evidence in the hands of the "prosecution," 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 218, we feel that this principle of due process applies equally to all parts of the government. Indeed, the concern of Brady was for the entire system of the administration of justice.

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly, 373

U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, 218.

The breadth of the majority position must be that an exculpatory statement in the hands of the President or the Congress which absolutely absolves a defendant, could be withheld with impunity, even though resulting in a defendant's conviction. The underpinning for this argument is the privilege to withhold. Fortunately, the Supreme Court has restricted this governmental privilege departure from the Anglo-American tradition that the public has a right to every man's evidence except those protected by a constitutional, common law, or statutory privilege. See Branzburg v. Hayes, 1972, 408 U.S. 665, 687 & n. 26, 92 S.Ct. 2646, 33 L.Ed.2d 626, 644 & n. 26.

In United States v. Nixon, supra, the court said:

> "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense. 418 U.S. at 709, 94 S.Ct. at 3108, 41 L.Ed.2d 1064.

This statement of the philosophy of the adversary system in criminal justice is repeated in United States v. Nobles, 1975, —— U.S. ——, 95 S.Ct. 2160, 45 L.Ed.2d 141.

United States v. Beekman, 2 Cir., 1946, 155 F.2d 580; United States v. Andolschek, 2 Cir., 1944, 142 F.2d 503.

---

4. Note, A Defendant's Right to Inspect Pretrial Congressional Testimony of Government Witnesses, 1971, 80 Yale L.J. 1388, 1411; see

In *United States v. Nixon,* the President challenged a subpoena served on him as a third party requiring the production of materials for use in a criminal prosecution on the ground of privilege. The Supreme Court, rejecting the claim of privilege, held:

"We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." 418 U.S. at 713, 94 S.Ct. at 3110, 41 L.Ed.2d at 1066, 1067.

The Nixon holding is applicable to this case. Congress has no greater privilege than the President in the circumstances presented. There was no claim of privilege or of confidentiality except for the letter referred to in the majority opinion stating that testimony would be taken in executive session to avoid prejudicing the rights of any defendant in the My Lai prosecution. There is no general claim of secrecy under Art. I, § 5, Cl. 3, of the Constitution.

We would hold that the government, through Congress, caused the army, *prima facie,* to deny Lt. Calley due process of law in withholding the testimony of the witnesses who testified against Calley. We say *prima facie* because the testimony has never been examined for its materiality on mitigation, culpability or impeachment.

This brings us to the remedy we would afford. The district court should be directed to examine the testimony of the witnesses before Congress for materiality. Should it prove to be material, the writ should issue conditioned on the retrial of Lt. Calley within a reasonable time. If not material, the writ should be denied. In the event Congress refuses to produce the testimony or refuses to claim constitutional secrecy within a reasonable time, the district court should grant the writ conditioned upon the retrial of Lt. Calley, but with the stipulation that those witnesses whose testimony before the subcommittee is sought and not obtained shall not be allowed to testify.[5] These directions are without prejudice to the district court considering the testimony *in camera* for materiality should congress so request.[6]

One underlying principle of American jurisprudence is that no man or institution is above the law. Congress is not exempt from this principle. The military judge sustained this principle in the Sgt. Mitchell My Lai trial, n. 5 *supra.* The military judge failed to uphold this principle in the Calley trial. The majority of this court now condones that breach.

---

**5.** This form of relief was used in the trial of Staff Sgt. David Mitchell also accused of taking part in the My Lai incident. The military judge held that Mitchell had the right to inspect the congressional testimony. Upon Congress's refusal to reply, the judge forbade the prosecution from calling those witnesses who had testified before the subcommittee. *United States v. Mitchell,* Decision on the Jencks Act motion (U.S. Army, Oct. 15, 1970), cited in 80 Yale L.J. 1388, *supra.*

**6.** We have no reason to answer at this time any question as to remedy, in the event constitutional secrecy is claimed and sustained. In such event, the district court would be required to balance the rights of Lt. Calley to evidence with the constitutional right afforded Congress to secrecy. *Roviaro v. United States,* 1957, 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639, 646. *See also* Note, A Defendant's Right to Inspect Pre-trial Congressional Testimony of Government Witnesses, 1971, 80 Yale L.J. 1388, *supra.*